## LAW STUDENTS CIVIL RIGHTS RESEARCH COUNCIL, INC., ET AL. *v.* WADMOND ET AL.

No. 49.   Argued October 15, 1970—Decided February 23, 1971

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, WHITE, and BLACKMUN, JJ., joined. HARLAN, J., filed a concurring opinion, *ante*, p. 34. BLACK, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post*, p. 174. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 185.

*Norman Dorsen* argued the cause for appellants. On the brief for appellants Law Students Civil Rights Research Council, Inc. et al. were *Alan H. Levine, Jeremiah S. Gutman, Melvin L. Wulf,* and *Sanford Jay Rosen.* On the brief for appellants Wexler et al. were *Leonard B. Boudin, Victor Rabinowitz,* and *David Rosenberg.*

*David W. Peck* argued the cause for appellees. With him on the brief were *Louis J. Lefkowitz,* Attorney General of New York, *Daniel M. Cohen,* Assistant Attorney General, and *Michael M. Maney.*

MR. JUSTICE STEWART delivered the opinion of the Court.

An applicant for admission to the Bar of New York must be a citizen of the United States, have lived in the State for at least six months, and pass a written examination conducted by the State Board of Law Examiners. In addition, New York requires that the Appellate Division of the State Supreme Court in the judicial department where an applicant resides must "be satisfied that such person possesses the character and general fitness requisite for an attorney and counsellor-at-law." New York Judiciary Law § 90, subd. 1, par. a (1968).[1] To carry out this provision, the New York Civil Practice Law and Rules require the appointment, in each of the four Judicial Departments into which the Supreme Court is divided, of a Committee or Committees on Character and Fitness.[2] Section 528.1 of the Rules of the New York Court of Appeals for the Admission of Attorneys and Counsellors-at-Law requires that the character and general fitness specified in Judiciary Law § 90 "must be shown by the affidavits of two reputable persons residing in the city or county in which [the applicant] resides, one of whom must be a practicing attorney of the Supreme Court of this State." [3] The Committees also re-

_____

[1] The New York statute, rules, and affidavit forms relevant to the issues in this litigation are set out in the Appendix to this opinion.

[2] N. Y. Civ. Prac. Law and Rules, Rule 9401 (1963); see also *id.,* Rule 9404.

These Rules, originally enacted by the State Legislature, may be amended either by the legislature or by the New York Judicial Conference. N. Y. Judiciary Law § 229, subd. 3 (1968); N. Y. Civ. Prac. Law and Rules, Rule 102 (1963).

[3] N. Y. Judiciary Law Appendix § 528.1 (Supp. 1970). This section, recently renumbered with no change in its wording, is referred to throughout the briefs and earlier opinions as Rule VIII of the New York Court of Appeals.

quire the applicant himself to fill out a questionnaire.[4] After receipt of the affidavits and questionnaire, the Committees conduct a personal interview with each applicant. As a final step before actual admission to the Bar, an applicant must take an oath that he will support the Constitutions of the United States and of the State of New York.[5]

This case involves a broad attack, primarily on First Amendment vagueness and overbreadth grounds, upon this system for screening applicants for admission to the New York Bar. The appellants, plaintiffs in the trial court, are organizations and individuals claiming to represent a class of law students and law graduates similarly situated, seeking or planning to seek admission to practice law in New York. They commenced two separate actions for declaratory and injunctive relief in the United States District Court for the Southern District of New York, naming as defendants two Committees on Character and Fitness and their members and two Appellate Divisions and their judges.[6] The complaints attacked the statutes, rules, and screening procedures as invalid on their face or as applied in the First and Second Departments. A three-judge court was convened and consolidated the two suits.

In a thorough opinion, the court considered the appellants' claims and found certain items on the questionnaires as they then stood to be so vague, overbroad, and intrusive upon applicants' private lives as to be of doubtful constitutional validity.[7] It granted the partial

---

[4] Answers to these questionnaires are treated as confidential.

[5] N. Y. Judiciary Law § 466 (1968); N. Y. Const., Art. XIII, § 1.

[6] The suits were brought under 28 U. S. C. § 1343 (3) and 42 U. S. C. § 1983.

[7] 299 F. Supp. 117. The appellees had already, both before and after the commencement of this litigation, eliminated or revised

relief indicated by these findings, approving or further amending the revised questions submitted by the appellees to conform to its opinion.[8]  It upheld the statutes and rules as valid on their face and, with the exceptions noted, sustained the validity of New York's system. This appeal followed, and we noted probable jurisdiction.  396 U. S. 999.[9]

We note at the outset that no person involved in this case has been refused admission to the New York Bar. Indeed, the appellants point to no case in which they claim any applicant has ever been unjustifiably denied permission to practice law in New York State under these or earlier statutes, rules, or procedures.  The basic thrust of the appellants' attack is, rather, that New

certain questions to which the appellants had originally raised objections.  See *id.*, at 129 and n. 6.

[8] No cross-appeal has been taken from this partial grant of the requested injunction.  We therefore have no occasion to consider whether the District Court's action was correct.

[9] Our jurisdiction of this appeal rests on 28 U. S. C. § 1253, the three-judge panel having been properly convened since the suits attacked state statutes as violative of the Federal Constitution and requested injunctive relief, 28 U. S. C. § 2281, which the District Court partially denied.

The appellees are the Committees on Character and Fitness of the First and Second Departments; their individual members; the First and Second Departments of the Appellate Division of the Supreme Court of the State of New York; and their individual justices.  The appellees contend, as they did below, that the state courts and their justices are not within the jurisdiction of the federal courts because they are not "persons" within the meaning of 42 U. S. C. § 1983.  The District Court rejected this argument, reasoning that the courts and the justices were acting in an administrative capacity and that an injunction here could have no inhibiting effect on the proper performance of judicial duties.  299 F. Supp., at 123–124.  The appellees took no cross-appeal and did not press the point in their motion to affirm.  We therefore pursue the matter no further.

York's system by its very existence works a "chilling effect" upon the free exercise of the rights of speech and association of students who must anticipate having to meet its requirements.

## I

The three-judge District Court, although divided on other questions, was unanimous in finding no constitutional infirmity in New York's statutory requirement that applicants for admission to its Bar must possess "the character and general fitness requisite for an attorney and counsellor-at-law." [10] We have no difficulty in affirming this holding. See *Konigsberg* v. *State Bar,* 366 U. S. 36, 40–41; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 247 (Frankfurter, J., concurring). Long usage in New York and elsewhere has given well-defined contours to this requirement, which the appellees have construed narrowly as encompassing no more than "dishonorable conduct relevant to the legal profession," see 299 F. Supp., at 144 n. 20 (separate opinion of Motley, J.); see also *Schware* v. *Board of Bar Examiners, supra,* at 247 (Frankfurter, J., concurring). The few reported cases in which bar admission has been denied on character grounds in New York all appear to have involved instances of misconduct clearly inconsistent with the standards of a lawyer's calling.[11]

---

[10] 299 F. Supp., at 124–125 (majority opinion of Friendly, J.); *id.,* at 143–144 (separate opinion of Motley, J.).

[11] See, *e. g., Matter of Cassidy,* 268 App. Div. 282, 51 N. Y. S. 2d 202, aff'd *per curiam,* 296 N. Y. 926, 73 N. E. 2d 41; *Matter of Portnow,* 253 App. Div. 395, 2 N. Y. S. 2d 553; *Matter of Greenblatt,* 253 App. Div. 391, 2 N. Y. S. 2d 569; *Matter of Peters,* 221 App. Div. 607, 225 N. Y. S. 144, aff'd *per curiam,* 250 N. Y. 595, 166 N. E. 337; cf. *Matter of Anonymous,* 17 N. Y. 2d 674, 216 N. E. 2d 612.

Cf. also *In re Stolar, ante,* p. 23, in which it appears that the petitioner there had previously been admitted to the New York Bar

This Court itself requires of applicants for admission to practice before it that "their private and professional characters shall appear to be good." [12] Every State, plus the District of Columbia, Puerto Rico, and the Virgin Islands, requires some similar qualification. [13]

But, the appellants contend, even though the statutory standard may be constitutionally valid, the methods used by the Committees to satisfy themselves that applicants meet that standard are not. Specifically, the appellants object to the terms of the third-party affidavits attesting to an applicant's good moral character. During this litigation, the appellees revised the affidavit forms in several respects. Whatever may have been said of the affidavits formerly used, we can find nothing in the present forms remotely vulnerable to constitutional attack. In the Second Department, for example, an affiant is asked to state whether he has visited the applicant's home and, if so, how often. We think it borders on the frivolous to say that such an inquiry offends the applicant's "right to privacy protected by the First, Fourth, Ninth, and Fourteenth Amendments." It is the applicant who selects the two people who will sign affidavits on his behalf, and the Committees may reasonably inquire as to the nature and extent of an affiant's actual acquaintance with the applicant. [14]

---

under the standards in use before the commencement of this litigation. There is, moreover, no indication that either Charles Evans Hughes or John W. Davis, despite the fears reflected in MR. JUSTICE BLACK's dissenting opinion, *post*, at 180–181, encountered any difficulty whatever in gaining admission to the New York Bar.

[12] U. S. Sup. Ct. Rule 5 (1).

[13] See 5 1971 Martindale-Hubbell Law Directory, *passim* (103d ed. 1970).

[14] In the District Court the appellants also attacked—unsuccessfully—the practice of conducting personal interviews. They do not appear to press such objections here, either as to the practice generally or as to the conduct of any particular interviews.

## II

As stated at the outset of this opinion, New York has further standards of eligibility for admission to its Bar. An applicant must be a United States citizen and a New York resident of six months' standing. And before he may be finally admitted to practice, an applicant must swear (or affirm) that he will support the Constitutions of the United States and of the State of New York. Reflecting these requirements, Rule 9406 of the New York Civil Practice Law and Rules directs the Committees on Character and Fitness not to certify an applicant for admission "unless he shall furnish satisfactory proof to the effect" that he is a citizen of the United States, has resided in New York for at least six months, has complied with the applicable statutes and rules, and "believes in the form of the government of the United States and is loyal to such government."

The appellants do not take issue with the citizenship and minimum-residence requirements, nor with the items on the questionnaires for applicants dealing with these requirements. Their constitutional attack is mounted against the requirement of belief "in the form of" and loyalty to the Government of the United States, and upon those parts of the questionnaires directed thereto.

We do not understand the appellants to question the constitutionality of the actual oath an applicant must take before admission to practice. In any event, there can be no doubt of its validity. It merely requires an applicant to swear or affirm that he will "support the constitution of the United States" as well as that of the State of New York. See *Knight* v. *Board of Regents,* 269 F. Supp. 339, aff'd *per curiam,* 390 U. S. 36; *Hosack* v. *Smiley,* 276 F. Supp. 876, aff'd *per curiam,* 390 U. S.

744; *Ohlson* v. *Phillips,* 304 F. Supp. 1152, aff'd *per curiam,* 397 U. S. 317.[15]

If all we had before us were the language of Rule 9406, which seems to require an applicant to furnish proof of his belief in the form of the Government of the United States and of his loyalty to the Government, this would be a different case. For the language of the Rule lends itself to a construction that could raise substantial constitutional questions, both as to the burden of proof permissible in such a context under the Due Process Clause of the Fourteenth Amendment, *Speiser* v. *Randall,* 357 U. S. 513, and as to the permissible scope of inquiry into an applicant's political beliefs under the First and Fourteenth Amendments, *e. g., Baggett* v. *Bullitt,* 377 U. S. 360; *Barenblatt* v. *United States,* 360 U. S. 109; *Speiser* v. *Randall, supra,* at 527; *Beilan* v. *Board of Public Education,* 357 U. S. 399; *Sweezy* v. *New Hampshire,* 354 U. S. 234. But this case comes before us in a significant and unusual posture: the appellees are the very state authorities entrusted with the definitive interpretation of the language of the Rule. We therefore accept their interpretation, however we might construe that language were it left for us to do so. If the appellees be regarded as state courts, we are of course bound by their construction. See, *e. g., Baggett*

---

[15] Cf. U. S. Const., Art. VI, cl. 3:

"The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution . . . ."

See also U. S. Sup. Ct. Rule 5 (4), requiring an applicant for admission to the Bar of this Court to swear or affirm that he will "support the Constitution of the United States."

v. *Bullitt, supra,* at 375; *Kingsley International Pictures Corp.* v. *Regents of the University,* 360 U. S. 684, 688; *Speiser* v. *Randall, supra,* at 519; *Terminiello* v. *Chicago,* 337 U. S. 1, 5–6. If they are viewed as state administrative agencies charged with enforcement and construction of the Rule, their view is at least entitled to "respectful consideration," *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 96 (Cardozo, J.), and we see no reason not to accept their interpretation in this case.

The appellees have made it abundantly clear that their construction of the Rule is both extremely narrow and fully cognizant of protected constitutional freedoms.[16] There are three key elements to this construction. First, the Rule places upon applicants no burden of proof.[17] Second, "the form of the government of the United States" and the "government" refer solely to the Constitution, which is all that the oath mentions. Third, "belief" and "loyalty" mean no more than willingness to take the constitutional oath and ability to do so in good faith.

Accepting this construction, we find no constitutional invalidity in Rule 9406. There is "no showing of an intent to penalize political beliefs." *Konigsberg* v. *State Bar,* 366 U. S., at 54. At the most, the Rule as authoritatively interpreted by the appellees performs only the

---

[16] Rule 9406 does not itself directly impinge upon applicants; it is rather an instruction to the appellees, touching applicants only as filtered through the appellees' construction.

[17] As this case comes to us from the District Court, the sum total of what applicants must do in the first instance to satisfy any "burden" placed upon them by the Rule is simply to answer two questions on the questionnaire they submit to the appellee committees. These questions are discussed in Part III of this opinion, *infra.*

function of ascertaining that an applicant is not one who "swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath." *Bond* v. *Floyd,* 385 U. S. 116, 132.

## III

As this case comes to us from the three-judge panel, the questionnaire applicants are asked to complete contains only two numbered questions reflecting the disputed provision of Rule 9406.[18]  They are as follows:

"26. (a) Have you ever organized or helped to organize or become a member of any organization or group of persons which, during the period of your membership or association, you knew was advocating or teaching that the government of the United States or any state or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means? ——— If your answer is in the affirmative, state the facts below.

---

[18] The District Court ordered the elimination or revision of the following questions contained in the questionnaires at the time this litigation was commenced:

"26. Have you ever organized or helped to organize or become a member of or participated in any way whatsoever in the activities of any organization or group of persons which teaches (or taught) or advocates (or advocated) that the Government of the United States or any State or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means? ——— If your answer is in the affirmative, state the facts below.

"27 (a). Do you believe in the principles underlying the form of government of the United States of America?  ———"

"31. Is there any incident in your life not called for by the foregoing questions which has any favorable or detrimental bearing on your character or fitness?  ——— If the answer is 'Yes' state the facts." [In the Second Department the words "favorable or" did not appear.]

None of the above questions is in issue here.

"(b) If your answer to (a) is in the affirmative, did you, during the period of such membership or association, have the specific intent to further the aims of such organization or group of persons to overthrow or overturn the government of the United States or any state or any political subdivision thereof by force, violence or any unlawful means?

"27. (a) Is there any reason why you cannot take and subscribe to an oath or affirmation that you will support the constitutions of the United States and of the State of New York? If there is, please explain.

"(b) Can you conscientiously, and do you, affirm that you are, without any mental reservation, loyal to and ready to support the Constitution of the United States?" ———.

In dealing with these questions, we emphasize again that there has been no showing that any applicant for admission to the New York Bar has been denied admission either because of his answers to these or any similar questions, or because of his refusal to answer them. Necessarily, therefore, we must consider the validity of the questions only on their face, in light of Rule 9406 as construed by the agencies entrusted with its administration.

Question 26 is precisely tailored to conform to the relevant decisions of this Court. Our cases establish that inquiry into associations of the kind referred to is permissible under the limitations carefully observed here. We have held that knowing membership in an organization advocating the overthrow of the Government by force or violence, on the part of one sharing the specific intent to further the organization's illegal goals, may be made criminally punishable. *Scales* v. *United States,* 367 U. S. 203, 228–230. It is also well settled that Bar examiners may ask about Communist

affiliations as a preliminary to further inquiry into the nature of the association and may exclude an applicant for refusal to answer. *Konigsberg* v. *State Bar,* 366 U. S., at 46–47. See also, *e. g., United States* v. *Robel,* 389 U. S. 258; *Keyishian* v. *Board of Regents,* 385 U. S. 589; *Elfbrandt* v. *Russell,* 384 U. S. 11; *Beilan* v. *Board of Public Education,* 357 U. S. 399; *Garner* v. *Board of Public Works,* 341 U. S. 716.[19] Surely a State is constitutionally entitled to make such an inquiry of an applicant for admission to a profession dedicated to the peaceful and reasoned settlement of disputes between men, and between a man and his government. The very Constitution that the appellants invoke stands as a living embodiment of that ideal.

As to Question 27, there can hardly be doubt of its constitutional validity in light of our earlier discussion of Rule 9406 and the appellees' construction of that Rule. The question is simply supportive of the appellees' task of ascertaining the good faith with which an applicant can take the constitutional oath. Indeed, the "without any mental reservation" language of part (b) is the same phrase that appears in the oath required of all federal uniformed and civil service personnel. 5 U. S. C. § 3331 (1964 ed., Supp. V). New York's question, however, is less demanding than the federal oath. Taking the oath is a requisite for federal employment, but there is no indication that a New York Bar applicant would not be given the opportunity to explain any "mental reservation" and still gain admission to the Bar.

---

[19] Division of Question 26 into two parts is wholly permissible under *Konigsberg* v. *State Bar, supra,* which approved asking whether an applicant had ever been a member of the Communist Party without asking in the same question whether the applicant shared its illegal goals. Moreover, this division narrows the class of applicants as to whom the Committees are likely to find further investigation appropriate. For those who answer part (a) in the negative, that is the end of the matter.

## IV

Finally, there emerges from the appellants' briefs and oral argument a more fundamental claim than any to which we have thus far adverted. They suggest that, whatever the facial validity of the various details of a screening system such as New York's, there inheres in such a system so constant a threat to applicants that constitutional deprivations will be inevitable. The implication of this argument is that no screening would be constitutionally permissible beyond academic examination and extremely minimal checking for serious, concrete character deficiencies. The principal means of policing the Bar would then be the deterrent and punitive effects of such post-admission sanctions as contempt, disbarment, malpractice suits, and criminal prosecutions.

Such an approach might be wise policy, but decisions based on policy alone are not for us to make. We have before us a State whose agents have evidently been scrupulous in the use of the powers that the appellants attack, and who have shown every willingness to keep their investigations within constitutionally permissible limits. We are not persuaded that careful administration of such a system as New York's need result in chilling effects upon the exercise of constitutional freedoms. Consequently, the choice between systems like New York's and approaches like that urged by the appellants rests with the legislatures and other policy-making bodies of the individual States. New York has made its choice. To disturb it would be beyond the power of this Court.

The judgment is

*Affirmed.*

[For concurring opinion of MR. JUSTICE HARLAN, see *ante,* p. 34.]

## APPENDIX TO OPINION OF THE COURT

New York Judiciary Law (1968): Article 4—Appellate Division.

§ 90.  Admission to and removal from practice by appellate division; character committees

1. a.  Upon the state board of law examiners certifying that a person has passed the required examination, or that the examination has been dispensed with, the appellate division of the supreme court in the department to which such person shall have been certified by the state board of law examiners, if it shall be satisfied that such person possesses the character and general fitness requisite for an attorney and counsellor-at-law, shall admit him to practice as such attorney and counsellor-at-law in all the courts of this state, provided that he has in all respects complied with the rules of the court of appeals and the rules of the appellate divisions relating to the admission of attorneys.

New York Civil Practice Law and Rules (1963): Article 94—Admission to Practice.

Rule 9401.  Committee

The appellate division in each judicial department shall appoint a committee of not less than three practicing lawyers for each judicial district within the department, for the purpose of investigating the character and fitness of every applicant for admission to practice as an attorney and counselor at law in the courts of this state. Each member of such committee shall serve until his death, resignation or the appointment of his successor. A lawyer who has been or who shall be appointed a member of the committee for one district may be appointed a member of the committee for another district within the same department.

Rule 9404.   Certificate of character and fitness

Unless otherwise ordered by the appellate division, no person shall be admitted to practice without a certificate from the proper committee that it has carefully investigated the character and fitness of the applicant and that, in such respects, he is entitled to admission.   To enable the committee to make such investigation the committee, subject to the approval of the justices of the appellate division, is authorized to prescribe and from time to time to amend a form of statement or questionnaire on which the applicant shall set forth in his usual handwriting all the information and data required by the committee and the appellate division justices, including specifically his present and past places of actual residence, listing the street and number, if any, and the period of time he resided at each place.

Rule 9406.   Proof

No person shall receive said certificate from any committee and no person shall be admitted to practice as an attorney and counselor at law in the courts of this state, unless he shall furnish satisfactory proof to the effect:

1. that he believes in the form of the government of the United States and is loyal to such government;

2. that he is a citizen of the United States;

3. that he has been an actual resident of the state of New York for six months prior to the filing of his application for admission to practice; and

4. that he has complied with all the requirements of this rule and with all the requirements of the applicable statutes of this state, the applicable rules of the court of appeals and the applicable rules of the appellate division in which his application is pending, relating to the admission to practice as an attorney and counselor at law.

New York Judiciary Law Appendix (Supp. 1970): Rules of the Court of Appeals for the Admission of Attorneys and Counselors-at-Law.

### PART 528—PROOF OF MORAL CHARACTER

## § 528.1 General regulation

Every applicant for admission to the bar must produce before a committee on character and fitness appointed by an Appellate Division of the Supreme Court and file with such committee evidence that he possesses the good moral character and general fitness requisite for an attorney and counselor at law as provided in section 90 of the Judiciary Law, which must be shown by the affidavits of two reputable persons residing in the city or county in which he resides, one of whom must be a practicing attorney of the Supreme Court of this State.

## § 528.2 Supporting affidavits

Such affidavits must state that the applicant is, to the knowledge of the affiant, a person of good moral character and must set forth in detail the facts upon which such knowledge is based. Such affidavits shall not be conclusive, and the court may make further examination and inquiry through its committee on character and fitness or otherwise.

## § 528.3 Certificate of Board of Law Examiners

Every applicant who pursued the study of law pursuant to these rules must file with such committee on character and fitness his certificate from the State Board of Law Examiners showing compliance with these rules.

## § 528.4 Discretion of Appellate Division

The justices of the Appellate Division in each department shall adopt for their respective departments such additional rules for ascertaining the moral and general fitness of applicants as to such justices may seem proper.

## AFFIDAVIT WITH RESPECT TO CHARACTER OF APPLICANT

# Supreme Court of the State of New York

APPELLATE DIVISION: FIRST JUDICIAL DEPARTMENT

> In the Matter of the Application
> of
> 1.
> ..........................*
> For Admission to the Bar

STATE OF
COUNTY OF   } ss.:

2. ..........................., being duly sworn, makes the following statement:

3. Residence of affiant:

4. Nature of affiant's business:

5. Business address of affiant:

6. Length and nature of affiant's acquaintance with applicant:
   a. Residence of applicant:
   b. Persons with whom applicant lives (if known to affiant):

7. Affiant's conclusions as to applicant's moral character:

8. Facts upon which affiant's knowledge or opinion as to applicant's moral character is based:

9. IF THIS AFFIDAVIT IS MADE BY THE SPONSORING ATTORNEY, his sponsors' statement (see items 9 and 10 of instruction sheet) may be made here:

.................................
(Signature)

Sworn to before me this ......
day of .............., 19....

(DO NOT FORGET TO HAVE ALL AFFIDAVITS NOTARIZED)
(NOTE: No back shall be put on Affidavits)

*Give name of applicant as it appears on the certificate of the State Board of Law Examiners.

NEW YORK SUPREME COURT,
APPELLATE DIVISION, SECOND
DEPARTMENT

IN THE MATTER OF THE
APPLICATION
of

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·
(Insert name of applicant)

for Admission to Practise as an Attorney and Counselor-at-Law

Form for Affidavit
of Character
and Residence

**PLEASE NOTE**
The answers to all questions are to be written, preferably in typewriting, by or under the direction of the affiant. It is desired that both the subject matter and the language of each answer shall be supplied by the affiant and not by the applicant. Nothing not personally known to affiant should be stated.

STATE OF. . . . . . . . . . . . . . . . . .⎱
COUNTY OF. . . . . . . . . . . . . . .⎰ ss.:

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·, the affiant, being duly sworn,
(Name of Affiant)

deposes and says that the answers to the following questions have been written by or under the direction of affiant, and that both questions and answers have been carefully read by affiant and that the several answers are true of affiant's own knowledge, except those stated to have been made on information and belief, and those stated to give the opinion or belief of affiant, and as to those answers, affiant believes them to be true.

1. (a) Home address of affiant (including County).
   (b) Business address.

2. Nature of business? (If a lawyer, state whether or not you are a *practising attorney* of the Supreme Court of the State of New York, and/or an attorney of any court or courts in any other state, country or jurisdiction, specifying each such state, country or jurisdiction, and give place of admission to the Bar, and approximate date of such admission.)

3. How long have you known the applicant personally?

4. State whether you are related to applicant by blood or marriage, or if there is any business, professional or similar relationship between you and the applicant or his family?

5. Describe briefly your associations with the applicant, setting forth how such associations began, and indicate in what activities (business, scholastic, cultural, recreational, athletic, social or otherwise) you have participated with applicant. It is not a sufficient answer merely to repeat the above words in parenthesis, but the particular activities should be specified.

6. How often have you come in contact with applicant during the entire period of acquaintance? ("Frequently" or "often" or other indefinite statement is not a satisfactory answer.)

7. What is your conclusion as to applicant's moral character? (Reserve details for next question.)

8. State in detail the facts upon which your knowledge or opinion as to applicant's character is based.

9. Have you visited applicant's
    (a) parental home;
    (b) marital home, if any;
    (c) any other home or place of abode applicant may have had?

10. (a) How often have you visited the parental, marital or other home or place of abode of applicant? ("Frequently" or "often" or other indefinite statement is not a satisfactory answer. Note that in most cases visits will be less frequent than the contacts mentioned in Q. 6, above.)

    (b) During what years (stating approximate dates)?

    (c) At what addresses (listing them specifically)?

(Insert date)

Sworn to before me this

day of          19        .............................
                                         (Affiant to sign here)

..............................
    (Attesting officer to sign here)

..............................
    (Official designation)

Mr. Justice Black, with whom Mr. Justice Douglas joins, dissenting.

Of course I agree that a State may require that applicants and members of the Bar possess the good "character and general fitness requisite for an attorney." But it must be remembered that the right of a lawyer or Bar applicant to practice his profession is often more valuable to him than his home, however expensive that home may be. Therefore I think that when a State seeks to deny an applicant admission or to disbar a lawyer, it must proceed according to the most exacting demands of due process of law. This must mean at least that the right of a lawyer or Bar applicant to practice cannot be left to the mercies of his prospective or present competitors. When it seeks to deprive a person of the right to practice law, a State must accord him the same rights as when it seeks to deprive him of any other property. Perhaps almost anyone would be stunned if a State sought to take away a man's house because he failed to prove his loyalty or refused to answer questions about his political beliefs. But it seems to me that New York is attempting to deprive people of the right to practice law for precisely these reasons, and the Court is approving its actions.

Here the Court upholds a New York law which requires that a Bar applicant not be admitted "unless he shall furnish satisfactory proof" that he "believes in the form of the government of the United States and is loyal to such government." Rule 9406, New York Civil Practice Law and Rules. It also approves certain questions about political associations and beliefs which New York requires all applicants to answer. From these holdings I dissent.

In my view, the First Amendment absolutely prohibits a State from penalizing a man because of his beliefs. *American Communications Assn.* v. *Douds,* 339 U. S.

382, 445 (1950) (BLACK, J., dissenting). Hence a State cannot require that an applicant's belief in our form of government be established before he can become a lawyer. As Mr. Justice Roberts said in *Cantwell* v. *Connecticut:*

> "Thus the Amendment embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." 310 U. S. 296, 303–304 (1940).

Assuming that a New York statute could constitutionally delegate to a committee of lawyers the power to interrogate applicants for the Bar, the specific questions asked in this case are flatly inconsistent with the First Amendment. Questions 26 (a) and 26 (b) state:

> "(a) Have you ever organized or helped to organize or become a member of any organization or group of persons which, during the period of your membership or association, you knew was advocating or teaching that the government of the United States or any state or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means? ——— If your answer is in the affirmative, state the facts below.
>
> "(b) [D]id you, during the period of such membership or association, have the specific intent to further the aims of such organization or group of persons to overthrow or overturn the government of the United States or any state or any political subdivision thereof by force, violence or any unlawful means?"

I do not think that a State can, consistently with the First Amendment, exclude an applicant because he has belonged to organizations that advocate violent overthrow of the Government, even if his membership was "knowing" and he shared the organization's aims. *Yates*

v. *United States,* 354 U. S. 298, 339 (1957) (BLACK, J.,
concurring and dissenting). *American Communications
Assn.* v. *Douds,* 339 U. S. 382, 445 (1950) (BLACK,
J., dissenting). The First Amendment was intended to
make speech free from government control, even speech
which is dangerous and unpopular. And included within
the protection of the First Amendment is the right of
association; the right to join organizations which them-
selves advocate ideas. *NAACP* v. *Alabama,* 357 U. S.
449 (1958); *Bates* v. *Little Rock,* 361 U. S. 516, 527 (1960)
(BLACK, J., and DOUGLAS, J., concurring); *Schneider* v.
*Smith,* 390 U. S. 17 (1968). It therefore follows for me
that governments should not be able to ask questions
designed to identify persons who have belonged to cer-
tain political organizations and then exclude them from
the practice of law.

Question 27 (b) asks: "Can you conscientiously, and
do you, affirm that you are, without any mental reserva-
tion, loyal to and ready to support the Constitution of
the United States?" In my view, this question also in-
vades areas of belief protected by the First Amendment.
Here the State seeks to probe an applicant's state of mind
to ascertain whether he is "without any mental reserva-
tion, loyal to . . . the Constitution." But asking about
an applicant's mental attitude toward the Consti-
tution simply probes his beliefs, and these are not the
business of the State. *Cantwell* v. *Connecticut, supra;
American Communications Assn.* v. *Douds, supra* (BLACK,
J., dissenting); cf. *In re Summers,* 325 U. S. 561, 573
(1945) (BLACK, J., dissenting). For these reasons, I
would reverse the judgment of the court below.

Wholly aside from my own views in dissent on what
the First Amendment demands, I do not see how today's
decision can be reconciled with other decisions of this
Court, to which I shall refer later. The majority seeks

to avoid this conflict by a process of narrowing construction. It states:

> "First, the Rule places upon applicants no burden of proof. Second, 'the form of the government of the United States' and the 'government' refer solely to the Constitution, which is all that the oath mentions. Third, 'belief' and 'loyalty' mean no more than willingness to take the constitutional oath and ability to do so in good faith." *Ante,* at 163.

Thus despite the New York law's command that no applicant shall be admitted "unless he shall furnish satisfactory proof" of his belief and loyalty, the Court holds that this law places on him no burden of proof. The Court seems to assert that this "construction" avoids the problems posed by *Speiser* v. *Randall,* 357 U. S. 513 (1958), where we held that taxpayers in order to obtain tax exemptions could not be made to bear the burden of proving that they did not advocate violent overthrow of the Government. We there pointed out that such an allocation of the burden of proof "can only result in a deterrence of speech which the Constitution makes free" because the "man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens." *Id.,* at 526. I do not believe the Court's narrowing construction here avoids the force of *Speiser* for in this case the District Court determined, and the appellees do not contend otherwise, that the New York law places on the applicant a burden of "coming forward with some evidence" to satisfy the Committee. 299 F. Supp. 117, 147. In my view, even this shifting of the burden of coming forward is impermissible in light of *Speiser* v. *Randall.* The Court held in *Speiser* that

the defect in the California procedure was not only that the applicant bore the final burden of persuasion but that "when the constitutional right to speak is sought to be deterred by a State's general taxing program due process demands that the speech be unencumbered until *the State comes forward with sufficient proof to justify its inhibition." Id.*, at 528–529 (emphasis added). Although that case dealt with a tax exemption applicable to veterans, I can see no reason why the First Amendment should offer any less protection to applicants for admission to the Bar. If there is to be any difference at all, I should think a man's right to practice a profession should be accorded greater protection than his right to a tax exemption.

In Part III of its opinion the Court holds that New York may demand an answer to Question 27 (b) which asks whether the applicant is loyal to the Constitution "without any mental reservation."* The majority reasons that an answer to this question may be required because it assists the Committee in assessing "the good faith with which an applicant can take the constitutional oath." This constitutional oath referred to is simply a pledge that the applicant will "support the Constitution of the United States" and that of New York. I have no doubt whatsoever about the validity of this oath. See *Knight* v. *Board of Regents,* 269 F. Supp. 339 (SDNY 1967), aff'd *per curiam,* 390 U. S. 36 (1968). But the issue here is whether New York can conduct an inquisition into an applicant's beliefs hoping to discredit the sincerity of his oath.

The question requires an applicant to affirm that he holds a certain belief, namely that he is "loyal" "without any mental reservation . . . to . . . the Constitution." This requirement is a quite different thing from New York's constitutional oath, which is similar to that

---

*The question is set out in full, *ante,* at 165.

required of the President and of applicants for admission to the Bar of this Court. The latter are promissory oaths in which the declarant promises that he will perform certain duties in the future. But Question 27 (b) does not require a promise of future action. It demands that an applicant swear that he holds a certain belief at that very moment, loyalty to the Constitution "without any mental reservation." Aside from the serious vagueness problems which inhere in an oath that one is "loyal" "without any mental reservation," cf. *Baggett* v. *Bullitt,* 377 U. S. 360 (1964), this is an attempt to deny admission to the Bar for failure to hold a certain belief. And we have consistently held that the First Amendment forbids a State to impose a sanction or withhold a benefit because of what a man believes. *Baird* v. *State Bar of Arizona, ante,* p. 1, at 6–7; *id.,* at 9 (STEWART, J., concurring in judgment); *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624 (1943); *Cantwell* v. *Connecticut, supra.*

The majority's reasoning that Question 27 (b) may be employed to test an applicant's sincerity also flatly ignores our unanimous holding in *Bond* v. *Floyd,* 385 U. S. 116 (1966). There the Georgia House of Representatives excluded duly elected member Julian Bond on the grounds that his statements criticizing the Vietnam war gave "aid and comfort to the enemies of the United States" and showed he did not support the Constitution. *Id.,* at 125. We held that exclusion on these grounds violated Bond's First Amendment rights. The appellees there argued strenuously that the First Amendment did not deprive them of power to test Bond's "sincerity." A three-judge Federal District Court, one judge dissenting, had accepted the appellees' theory. 251 F. Supp. 333 (1966). But we reversed the court below on the ground that the existence of an oath of office:

> "does not authorize a majority of state legislators to test the sincerity with which another duly elected

legislator can swear to uphold the Constitution. Such a power could be utilized to restrict the right of legislators to dissent from national or state policy or that of a majority of their colleagues under the guise of judging their loyalty to the Constitution." 385 U. S., at 132.

The majority offers no reason why a "sincerity test" may be applied to New York Bar applicants when it may not be applied to Georgia legislators.

Perhaps the majority considers it relevant that New York has not yet actually excluded a Bar applicant because of his lack of "sincerity" and perhaps would not permit such an exclusion.   Certainly the unanimous holding in *Bond* seems to compel the conclusion that it would not approve denial of admission to the New York Bar because of insincere oath taking.   Yet the majority opinion seems to indicate that such exclusion is permissible.   And if New York cannot constitutionally use the results of its "sincerity test" to exclude an applicant, what valid state interest can possibly be served by this inquiry into an applicant's beliefs?   *Baird* v. *State Bar of Arizona, supra,* at 6–7; *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539 (1963).

The only other possible ground I can see for the majority's failure to follow *Bond* v. *Floyd* is that it feels a state legislator's First Amendment rights are more worthy of protection than those of an applicant to the Bar.   If our form of representative government is to function as the Framers of our Federal and State Constitutions intended, the right of legislators to dissent freely is essential.   But the framers of the First Amendment intended also that its protection should extend not to some limited groups but to all citizens.   Just as a democratic society needs legislators willing and able to criticize national and state policy, so it needs lawyers who will defend unpopular causes and champion unpopular

clients. As I have pointed out in another case involving requirements for admission to the Bar, society needs men in the legal profession

"like Charles Evans Hughes, Sr., later Mr. Chief Justice Hughes, who stood up for the constitutional rights of socialists to be socialists and public officials despite the threats and clamorous protests of self-proclaimed super patriots—men like Charles Evans Hughes, Jr., and John W. Davis, who, while against everything for which the Communists stood, strongly advised the Congress in 1948 that it would be unconstitutional to pass the law then proposed to outlaw the Communist Party—men like Lord Erskine, James Otis, Clarence Darrow, and the multitude of others who have dared to speak in defense of causes and clients without regard to personal danger to themselves. The legal profession will lose much of its nobility and its glory if it is not constantly replenished with lawyers like these. To force the Bar to become a group of thoroughly orthodox, time-serving, government-fearing individuals is to humiliate and degrade it." *In re Anastaplo,* 366 U. S. 82, 115–116 (1961) (BLACK, J., dissenting).

The Court also holds that New York may require applicants to answer Questions 26 (a) and 26 (b), which inquire about their associational activities and which have been set out in full, *supra,* at 175. I fail to see how the majority's approval of these questions can be reconciled with *Baird* v. *State Bar of Arizona, supra,* and *In re Stolar, ante,* p. 23. The majority's conclusion that these questions do not violate the First Amendment seems to be based on the assumption that the State may punish a man for knowing membership in an organization which advocates violent overthrow of the Government if he specifically intends to bring about such overthrow. On this assumption, the majority ap-

pears to conclude that since such conduct is criminally punishable, the State may inquire about it in order to exclude an individual who has been a member of one of these organizations with the requisite intent.

In *Baird* v. *State Bar of Arizona* and *In re Stolar,* we hold today that States may not require an applicant to the Bar to answer the question "have you been a member of any organization that advocates overthrow of the government by force?" Ohio recognized in *Stolar* that it could not exclude an applicant unless he had knowledge of the organization's aims at the time of his membership. However, it argued that its question was appropriate because it was merely a prelude to determining whether petitioner was a "knowing" member. We rejected that argument, and held that the First Amendment barred Ohio from demanding an answer to that question which required an applicant to supply information about political activities protected by the First Amendment. *In re Stolar, supra,* at 30, and see *id.,* at 31 (STEWART, J., concurring in judgment). Here the majority seems to concede that New York could not possibly exclude an applicant unless he had been a member of an organization advocating forcible overthrow, he knew of these aims, and *he had a specific intent to help bring them about. Ante,* at 165–166. Since even on the majority's theory New York cannot exclude an applicant unless *all* these requirements are met, why is the State permitted to ask Question 26 (a) which makes no reference to "specific intent"? In *Baird* and *Stolar* five members of the Court agreed that questions asked by Bar admissions committees were invalid because they inquired about activities protected by the First Amendment. Why then is the same result not required here?

It may be argued, of course, that Question 26 is sufficiently specific under the majority's standard because parts (a) and (b) *taken together* do include a "specific

intent" requirement. But the Court's holding permits
the knowledge and specific intent elements of Question
26 to be split into two parts. This allows the State to
force an applicant to supply information about his as-
sociations, which, even under the majority's rationale, are
protected by the First Amendment.

But even if Questions 26 (a) and 26 (b) were combined
into one question, this would not satisfy the standards set
by the Court in *United States* v. *Robel,* 389 U. S. 258
(1967), and *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969).
*Robel* involved a section of the Subversive Activities
Control Act barring members of "communist-action" or-
ganizations from defense employment. The section was
struck down for overbreadth because it sought "to bar
employment both for association which may be proscribed
and for association which may not be proscribed consist-
ently with First Amendment rights." 389 U. S., at 266.
Thus the statute was found defective because it pur-
ported to bar persons on account of membership without
regard to whether they had been knowing members and
had an intent to overthrow the Government. In that case
we held the Federal Government could not bar a man
from private employment in defense facilities unless he
had engaged in conduct which could be criminally pro-
scribed. We recognized that banning a man from em-
ployment is a form of civil punishment which must meet
the requirements of the First Amendment. Cf. *Keyishian*
v. *Board of Regents,* 385 U. S. 589 (1967). And in
*Brandenburg* v. *Ohio, supra,* a unanimous Court made
clear that association with a group to advocate violence
cannot be punished consistently with the First Amend-
ment. In *Brandenburg* we struck down an Ohio statute
which purported to make criminal the act of associating
with an assembly to advocate violence to achieve political
reform. The Court held that advocacy of violence or the
joining with others to do so could not be proscribed "ex-

cept where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.,* at 447. Clearly the New York questions are not nearly so narrowly drawn. New York seeks to inquire about membership in organizations advising or teaching violent overthrow, for the purpose of excluding persons who knowingly belong to such organizations with the requisite intent. See Brief for Appellees 14–15. However, it does not specify that the organization's advocacy must have been "directed to inciting or producing imminent lawless action" and "likely to . . . produce such action." Thus, for their failure to meet the *Brandenburg* requirements, the New York questions are overbroad. After our decision in *Robel,* it should make no difference that New York threatens to exclude people from their chosen livelihood rather than to put them in jail.

Perhaps the majority fails to recognize the force of *Robel* and *Brandenburg* because Bar applicants seek to become members of a profession very important to the welfare of society; in the majority's words, a profession "dedicated to the peaceful and reasoned settlement of disputes between men, and between a man and his government." *Ante,* at 166. Unfortunately, there is some support in our past decisions for the proposition that lawyers are such a special group that they should not enjoy the full measure of constitutional rights accorded other citizens. See, *e. g., Cohen* v. *Hurley,* 366 U. S. 117 (1961), where this Court held that a New York lawyer could be disbarred solely for relying on his privilege against self-incrimination and refusing to answer certain questions in a state investigation of professional misconduct. But I had thought that any such theory was clearly repudiated by our decision in *Spevack* v. *Klein,* 385 U. S. 511 (1967), which expressly overruled *Cohen.* In *Spevack* we held that New York could not disbar an

attorney for taking the Fifth Amendment in a disciplinary proceeding, and we stated:

> "Like the school teacher in *Slochower* v. *Board of Education,* 350 U. S. 551, and the policemen in *Garrity* v. *New Jersey* [385 U. S. 493] lawyers also enjoy first-class citizenship." 385 U. S., at 516.

I add only a few words, speaking as a member of the Bar. Quite obviously, its members should be men of high character and ability so that the Bar can fulfill the enormous responsibilities that face it. At the same time, its members and those who aspire to membership should not be disciplined or denied admission without full and unquestioned due process of law and protection of all their constitutional rights. Discipline or denial of admission should only take place after notice and hearing before an unquestionably impartial tribunal. I must repeat once again that consistently with due process of law, applicants for a profession cannot be turned over to the whim of their prospective competitors to determine their right to practice. I think the District Court did magnificent service in stripping the New York Bar of much of its unbridled power over the admission of new members. My only regret is that it did not strip it further.

For the foregoing reasons I respectfully dissent from the judgment of the Court.

MR. JUSTICE MARSHALL, whom MR. JUSTICE BRENNAN joins, dissenting.

This litigation began with a comprehensive constitutional attack by appellants on longstanding state rules and practices for screening applicants for admission to the New York Bar.[1] During the course of the litigation

---

[1] The attack is upon rules of statewide application and practices administered by appellees in the First and Second Judicial Departments.

some of these practices were changed by appellees; others were found wanting by the three-judge court below, and changed as a result of that court's opinion and its final order. Now we face the residuum of the appellants' original challenge, and the Court today ratifies everything left standing by the court below. I dissent from that holding because I believe that appellants' basic First Amendment complaint, transcending the particulars of the attack, retains its validity. The underlying complaint, strenuously and consistently urged, is that New York's screening system focuses impermissibly on the political activities and viewpoints of Bar applicants, that the scheme thereby operates to inhibit the exercise of protected expressive and associational freedoms by law students and others, and that this chilling effect is not justified as the necessary impact of a system designed to winnow out those applicants demonstrably unfit to practice law.

As an abstract matter I do not take issue with the proposition that some inquiry into the qualifications of Bar applicants may be made, beyond such obvious threshold qualifications as residence or success in a regularly administered written examination. Accordingly, I would not upset the general rules which charter an inquiry as to the "fitness" of applicants, absent a showing not made here, that in practice the general rules work an impermissible result. But this is hardly the end of the case. For New York is not content with a politically neutral investigation into the fitness of Bar applicants to practice law. Screening officials are specifically directed by state law to assess an applicant's political beliefs and loyalties, and to scrutinize his associational and other political activities for signs that the applicant holds certain viewpoints. Such an inquiry, in my view, flatly offends the First Amendment, and state laws or adminis-

trative rules that license such an inquiry must be struck down.

Rule 9406 of the New York Civil Practice Law and Rules prescribes: "No person . . . shall be admitted to practice . . . unless he shall furnish satisfactory proof to the effect . . . that he believes in the form of the government of the United States and is loyal to such government . . . ." [2] The Court rightly notes that Rule 9406 is addressed to the appellees, that is, to the investigating committees which pass in the first instance on applications for admission, and also to the relevant judicial department of the Appellate Division of the New York Supreme Court. Appellees, pursuant to Rule 9406, require Bar applicants to answer a questionnaire now containing two questions designed to uncover information about an applicant's political loyalties and associational affiliations. Question 27,[3] set forth in the margin, is one natural consequence of Rule 9406—part (b) of Question 27 commands an applicant to tell whether he is "without any mental reservation, loyal to and ready to support the Constitution." Question 26 [4] requires an

---

[2] The full text of Rule 9406 is printed, *ante,* at 169.

[3] "27. (a) Is there any reason why you cannot take and subscribe to an oath or affirmation that you will support the constitutions of the United States and of the State of New York? If there is, please explain.

"(b) Can you conscientiously, and do you, affirm that you are, without any mental reservation, loyal to and ready to support the Constitution of the United States?"

[4] "26. (a) Have you ever organized or helped to organize or become a member of any organization or group of persons which, during the period of your membership or association, you knew was advocating or teaching that the government of the United States or any state or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means? ———. If your answer is in the affirmative, state the facts below.

"(b) If your answer to (a) is in the affirmative, did you, during the period of such membership or association, have the specific

applicant to "state the facts" concerning his affiliation with any organization which he knew to advocate political change "by force, violence or any unlawful means." Under the scheme set in operation by Rule 9406, appellees' job is to evaluate all the information turned up by the questionnaire, by required affidavits, by a personal interview with the applicant, and by other means, and then to determine whether an applicant has made "satisfactory proof" of the specified political beliefs and loyalties.

I have no doubt whatever that Rule 9406, if read to mean what it says, must fall as violative of settled constitutional principles, or that any inquisition designed to implement a rule so written must equally be barred. Rule 9406 directs screening officials to probe the contents of an individual's political philosophy in order to ascertain whether he entertains certain beliefs as a matter of personal faith.  The Rule, which charters an inquisition, fastens, not upon overt conduct, nor even on activities that incidentally involve the public exposure or advocacy of ideas, but on personal belief itself.  Yet it is a settled principle of our constitutional order that, whatever may be the limits of the freedom to act on one's convictions, the freedom to believe what one will "is absolute."  *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940).  As we said not long ago in *Stanley* v. *Georgia,* 394 U. S. 557, 565 (1969), "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds."  The premise that personal beliefs are inviolate is fundamental to the constitutional scheme as a whole, see *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dis-

intent to further the aims of such organization or group of persons to overthrow or overturn the government of the United States or any state or any political subdivision thereof by force, violence or any unlawful means?"

senting), and the premise is not questioned even in cases where this Court has divided sharply over the extent of the First Amendment's protections. See, *e. g., American Communications Assn.* v. *Douds,* 339 U. S. 382, 412 (1950) (Vinson, C. J., for the Court), and *id.,* at 446–448 (BLACK, J., dissenting). In the present case we have a rule of New York law which, as written, sanctions systematic inquiry into the beliefs of Bar applicants, and excludes from the practice of law persons having beliefs that are not officially approved.[5] This inquiry and this criterion for exclusion are impermissible. However wayward or unorthodox a man's political beliefs may be, he may not be kept out or drummed out of the Bar or any other profession on that account.

The Court purports not to uphold—not to pass upon—Rule 9406 unvarnished. While conceding that the Rule, as it has been written, is constitutionally problematical, the Court asserts that it should be judged in light of the "extremely narrow" interpretation proffered by appellees, who are charged with administering the investigatory scheme contemplated by the Rule. According to the proposed administrative construction, Rule 9406 merely directs appellees to discover whether a Bar applicant is willing and able to promise that he will support the Constitutions of the United States and the State of New York. An oath promising support for the Federal and State Constitutions is required of persons

---

[5] In addition to the defects mentioned at text, Rule 9406, as written, violates the principle of *Speiser* v. *Randall,* 357 U. S. 513 (1958). Rule 9406 provides that "no person shall be admitted" to the New York Bar "unless he shall furnish satisfactory proof" of required beliefs and loyalties. *Speiser* condemns placing evidentiary burdens on an applicant for a public benefit, when the benefit may be denied because of the nature of the applicant's expressive and associational activities. Difficulties in proving the innocence of conduct may deter protected activity as much as a substantive standard that burdens privileged activity by its terms.

admitted to the practice of law in New York, as of state officers generally.[6] The Court's argument, then, is that since the "support" oath may validly be required, see *Knight* v. *Board of Regents,* 269 F. Supp. 339 (SD NY 1967), aff'd *per curiam,* 390 U. S. 36 (1968), it is permissible for appellees to inquire into the willingness and the ability of applicants to take the support oath in full honesty and good faith—further, that since Rule 9406 has been "construed" to sanction no more than such an inquiry into applicants' sincerity, the Rule and the whole investigatory scheme of the Rule should be upheld.

There are several flaws in the Court's analysis. We are told that while the Rule may be too sweeping, the administrative construction is narrow enough, so the construction saves the Rule. But this argument cannot merit embrace unless, in the first instance, we are able to ascertain the meaning and the sweep of the administrative interpretation itself. The majority opinion points to no New York case law that shows what the proffered interpretation means. Nor, I think, can the Court comfortably point to appellees' past practice as a guide to the proper interpretation of Rule 9406. For the opinions below and the papers in this case reveal that these appellees, prior to the launching of this litigation, thought it their duty to make virtually unlimited inquiry into an applicant's associational, political, and journalistic activities.[7] Thus past administrative practice, which may

---

[6] See N. Y. Judiciary Law § 466 and N. Y. Const., Art. 13, § 1, prescribing the following oath:

"I do solemnly swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of ——————, according to the best of my ability."

[7] Judge Motley's separate opinion below states portions of appellees' original, unrevised questionnaires that give some idea of appellees' original conception of their mission under Rule 9406. These questionnaires, utilized in the First or the Second Judicial

sometimes be helpful in clarifying the sweep of a doubtful law, cf. *Fox* v. *Standard Oil Co.*, 294 U. S. 87, 96–97 (1935), in this case is no help at all in settling constitutional doubts concerning the reach of Rule 9406. Appellees' announcement that they will be more restrained, and will focus their inquiries on "sincerity," is of course entitled to the full respect of a reviewing court. Nonetheless, I do not believe that Rule 9406 is saved by the announcement. At any rate, we certainly are not confronted by "long usage" giving "well-defined contours," see *ante,* at 159, to appellees' proposed construction of the challenged Rule.

A second defect of the Court's analysis is that any attempt to assimilate Rule 9406 to the "support" oath, for First Amendment purposes, must fail. The majority urges such an assimilation on the theory that " 'the form of the government of the United States' and the 'govern-

---

Department, or both, asked *inter alia* for a list of all "unfavorable incidents in your life," a list containing "each and every club, association, society or organization of which you are or have been a member," a list of "any articles for publication" written by an applicant. An applicant was asked whether he had ever "contributed in any way or signed a petition for" any subversive organization, or had "participated in any way whatsoever" in such organization's activities. Each applicant was required to "[s]tate . . . in not less than 100 words" what he thought were the "principles underlying the form of government of the United States." See 299 F. Supp., at 137–139.

The revised questionnaires for the two departments, the ones passed upon by the court below, had eliminated the most obvious constitutional defects of the original questionnaires. Still, certain remaining questions were found wanting in the District Court's opinion—for example, the precursor to present Question 26. In fact, the only question in the present questionnaire that appears to reflect an "extremely narrow" focus on insincerity of a prospective oath taker—Question 27 (a)—was drafted by the District Court as part of its final order. Appellees' own proposed rewording was rejected.

ment' [terms of Rule 9406] refer solely to the Constitution, which is all that the oath mentions." Yet as MR. JUSTICE BLACK's dissent today makes clear, the oath of constitutional support is promissory and forward looking in nature, while the focus of the challenged Rule is quite different. The oath of constitutional support requires an individual assuming public responsibilities to affirm, in entirely familiar and traditional language,[8] that he will endeavor to perform his public duties lawfully. This is a far cry from Rule 9406, or Question 27 (b) of appellees' questionnaires, both of which are designed to probe the personal political philosophy that an applicant entertains, his beliefs and loyalties and even his "mental reservations." To require the traditional oath of constitutional support does not put government in the censorial business of investigating, scrutinizing, interpreting, and then penalizing or approving the political viewpoints of individuals. For that reason the validity of the support oath is *sui generis,* and does not serve to justify the investigatory scheme set up by Rule 9406.

Surely it is a mistake to conclude that because a State may administer a support oath, it may therefore conduct an investigation into the beliefs and affiliations of Bar applicants in order to gauge the depth of their "willingness to take the constitutional oath and ability to do so in good faith." The seeming logic of this position was flatly repudiated in *Bond* v. *Floyd,* 385 U. S. 116 (1966). In that case the Court confronted the record of an actual inquiry into the "sincerity" of a prospective oath taker, and the inquiry was found to be an impermissible encroachment on First Amendment freedoms. The Court noted that the power "to test the sincerity" of a person who must take an oath of constitutional support "could be utilized to restrict the right . . . to dissent from na-

---

[8] See U. S. Const., Art. VI, cl. 3; U. S. Sup. Ct. Rule 5 (4).

tional or state policy . . . under the guise of judging . . . loyalty to the Constitution." *Id.,* at 132.[9] This is the very power which appellees claim under what the Court calls an "extremely narrow" construction of Rule 9406. It is a power of uncertain and dangerous dimension, and patently susceptible of censorial abuses.

For me the conclusion is inescapable that appellees' construction, far from saving Rule 9406, actually compounds its constitutional defects. The original vice of the Rule remains. State screening officials still are licensed to investigate an applicant's political activities and affiliations, and to probe his beliefs and loyalties and "mental reservations"—all this supposedly for the sake of protecting the integrity of the oath of constitutional support. The professed rationale of the enterprise may have been refurbished, but the search for true belief and unreserved loyalty remains. So construed, Rule 9406 is plainly overbroad. It sanctions overreaching

---

[9] In the Motion to Affirm appellees rely on the following language in *Bond:* "Nor is this a case where a legislator swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath." 385 U. S., at 132. This negative characterization of the facts in *Bond,* barely a dictum, should not be read to approve systematic inquiry into beliefs and affiliations in order to test "sincerity." Whatever a State may do when an oath taker himself contemporaneously "declares" or "manifests" contempt for the oath he is taking, it is quite a different matter to put the onus on a prospective oath taker to satisfy screening officials that his political activities and beliefs comport with the officials' notions of "sincerity." Indeed, Question 27 (a), which was written by the District Court, addresses the limited concerns of the *Bond* dictum and handles the remote risk that the oath-taking ceremony might be disrupted by an unwilling applicant. In pressing their search for sincerity beyond Question 27 (a), appellees cast serious doubt on their own assertion that Rule 9406 places no evidentiary burden on an applicant, and thereby reinforce the claim that Rule 9406 violates the principle of *Speiser* v. *Randall,* 357 U. S. 513 (1958). See n. 5 *supra.*

official inquiries. It is impermissibly sweeping as a criterion for exclusion from the Bar. The Rule as interpreted suffers from the very defects that this Court has found fatal to other schemes that have sought to predicate the grant or denial of public benefits on a person's political affiliations and viewpoints. See, *e. g., United States* v. *Robel,* 389 U. S. 258 (1967); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); cf. *Schneider* v. *Smith,* 390 U. S. 17 (1968).

Appellees' gloss compounds the defects of the Rule, in my view, because the proffered interpretation is vague in the extreme. It is of course conceivable that an inquiry into a Bar applicant's "sincerity" might be quite simple and definite in scope. Appellees suggest in the Motion to Affirm that some inquiry might be useful "to avoid the difficulty of having one individual demur to the taking of [the support] oath at the very moment prior to admission." But this limited objective of avoiding an embarrassing disruption of the admission ceremony is adequately handled by Question 27 (a), as drafted by the District Court. Plainly, appellees have a´ good deal more in mind, as is shown by their insistence that Question 26 and Question 27 (b) aid in determining an applicant's "sincerity." These are the questions that focus on beliefs, loyalties, and affiliations. I cannot say that a Bar applicant, a law student, or anyone else is given fair warning as to the kind of political activities and affiliations that appellees mean to penalize as evidencing "insincerity." Thus, in my view, Rule 9406, as construed, is fatally vague. Standards of definiteness must be strict as to legal rules which trench on First Amendment activities. *NAACP* v. *Button,* 371 U. S. 415, 432–433 (1963). See *United States* v. *National Dairy Corp.,* 372 U. S. 29, 36 (1963). The irreducible vices of due process vagueness, arising when those who

may be penalized by a legal rule cannot ascertain the rule's scope and avoid its burdens, see *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453 (1939), are inevitably heightened when the result is deterrence of protected activity. *Cramp* v. *Board of Public Instruction,* 368 U. S. 278, 287–288 (1961). Appellants' fundamental complaint throughout this litigation has concerned the inhibitory impact of New York's screening system on the exercise of First Amendment rights. I agree that the chilling effect of Rule 9406, as construed, is exacerbated by the sort of vagueness that this Court has condemned on a number of hardly distinguishable occasions. See, *e. g., Whitehill* v. *Elkins,* 389 U. S. 54 (1967); *Keyishian* v. *Board of Regents, supra; Dombrowski* v. *Pfister,* 380 U. S. 479 (1965); *Baggett* v. *Bullitt,* 377 U. S. 360 (1964); *Cramp* v. *Board of Public Instruction, supra.*

A further word is required concerning the validity of Question 26 of appellees' questionnaire. The Court expressly approves Question 26, but fails to consider the relationship of the question to Rule 9406 itself, beyond noting that Question 26 "reflects" the Rule's command that an applicant's beliefs and loyalties be investigated. I believe it is a mistake to consider the question entirely in isolation from the investigatory scheme set up by the Rule. See *Whitehill* v. *Elkins, supra,* at 56–57 ("we must consider the oath with reference to [related provisions concerning subversives], not in isolation"). Question 26 is undeniably a key part of that scheme. The District Court saw Rule 9406 as an instruction to screening officials "to satisfy themselves through analysis of the factual data before them" that an applicant has requisite beliefs and loyalties. See 299 F. Supp., at 126. Question 26 is a potent device for uncovering "factual data" about an applicant's associational affiliations.

Question 26 (a) asks whether the applicant has "ever organized or helped to organize or become a member of" any association that he knew was "advocating or teaching" that any local, state, or federal governmental institution "should be overthrown or overturned by force, violence or any unlawful means." Plainly this language covers a wide range of associational activities fully protected by the First Amendment, along with some conduct that may not be privileged. The question is not aimed at concerted activity of whatever sort oriented to the doing of illegal acts, but at affiliations with political associations that "advocate" or "teach" certain political ideas. All kinds and degrees of affiliation are covered: indifferent and energetic members alike, in well-disciplined organizations or in any transitory "group of persons." There is no specificity in the phrase, "overthrown or overturned by force, violence or any unlawful means." The language covers all advocacy of thoroughgoing political change to be brought about partly through unlawful acts—acts to be done now, or at some hypothetical future moment which may or may not occur—acts of bloody and atrocious terror, or conscientious action involving nonviolent disobedience to law. "Advocating or teaching" includes the most abstract sort of doctrinal discourse, and ideological utterances altogether ancillary to the political program of a given association.

Even when viewed in isolation from Rule 9406, Question 26 (a) reveals itself as an indiscriminate and highly intrusive device designed to expose an applicant's political affiliations to the scrutiny of screening authorities. As such, it comes into conflict with principles that bar overreaching official inquiry undertaken with a view to predicating the denial of a public benefit on activity pro-

tected by the First Amendment.[10]   Three particular difficulties may be mentioned.  First, Question 26 (a) is undeniably overbroad in that it covers the affiliations of those who do not adhere to teachings concerning unlawful political change, or are simply indifferent to this aspect of an association's activities.  *Elfbrandt* v. *Russell,* 384 U. S. 11, 16–19 (1966); *Aptheker* v. *Secretary of State,* 378 U. S. 500, 510–512 (1964).  Second, no attempt has been made to limit Question 26 (a) to associational advocacy of concrete, specific, and imminent illegal acts, or to associational activity that creates a serious likelihood of harm through imminent illegal conduct.  See *Brandenburg* v. *Ohio,* 395 U. S. 444, 447–449;

[10] Part (a) of Question 26 is not rendered harmless by reason of the fact that part (b) limits somewhat the breadth of the question as a whole.  In the first place, it must be remembered that neither part (a) nor part (b) states the operative criterion for excluding applicants on the basis of political affiliations—the criterion for exclusion, one of impermissible latitude, is given in Rule 9406 itself.  Second, if all applicants who answer part (b) in the affirmative were therefore excluded, while those falling within part (a) only were admitted, the result would still be constitutionally problematical.  See n. 11 *infra.*  Third, overreaching inquiries are not cured simply by adding narrower follow-up questions.  Obviously a State cannot hope to justify the sort of informational demand condemned today in *In re Stolar, ante,* p. 23, on the theory that the overintrusive inquiry is part of a series that culminates in a sufficiently narrow question.  When the questioning is directed at the political activities and affiliations of applicants for a public benefit, the scope of questioning must be carefully limited in light of the permissible criteria for denying the benefit.  *Schneider* v. *Smith,* 390 U. S. 17, 24 (1968); *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960).  There is no justification for a requirement of overbroad disclosure that chills the exercise of First Amendment freedoms and is not tailored to serve valid governmental interests.  See *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539, 546 (1963); *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960); *NAACP* v. *Alabama,* 357 U. S. 449, 462–463 (1958).

*Keyishian* v. *Board of Regents*, 385 U. S., at 599–601. Third, would-be Bar applicants are left to wonder whether particular political acts amount to "becom[ing] a member" of a "group of persons"—law students and others, when embarking on associational activities, must guess whether the association's teachings fall within the nebulous formula of Question 26 (a), or, more to the point, whether their own assessment of an association's teachings would coincide with that of screening officials. There are penalties for failing to "state the facts" required by Question 26 (a) when the time to make application comes. The indefinite scope of Question 26 (a) expectedly operates to induce prospective applicants to resolve doubts by failing to exercise their First Amendment rights. See *Dombrowski* v. *Pfister,* 380 U. S., at 493–494; *Baggett* v. *Bullitt,* 377 U. S., at 367–370.

But whatever may be thought of Question 26 or either of its two parts standing alone,[11] it remains that the function of the question is to generate "factual data" about an applicant's political affiliations and activities to be judged ultimately by the operative standards of Rule

---

[11] Part (b) of Question 26 limits part (a) in one respect: applicants affiliated with an association of the kind characterized in part (a), but who do not endorse the association's teachings concerning unlawful political change, need not answer part (b) in the affirmative. Naturally in other respects part (b) has the same sweep as part (a). "Specific intent" in this context means doctrinal agreement with the ideological tenets of part (a) associations—or, as appellees put it in their brief, "'specific intent' to further the advocacy" of drastic change to be brought about in part by unlawful means. Again the "unlawful means" might be nonviolent or bloodthirsty. The association might be a discussion group lasting for a week. The advocacy might be oriented to a far and contingent future or to the here and now; it might be innocuous or likely to cause imminent and serious harm. A prospective applicant might well be in doubt whether particular associational activity evinces "specific intent" or not—or whether, years later perhaps, screening officials would be willing to infer this state of mind.

9406. Doubts concerning the propriety of the question are intensified when the question is viewed realistically as part of the investigatory scheme set up by the Rule. Cf. *Whitehill* v. *Elkins,* 389 U. S. 54 (1967). In "stat[ing] the facts" as required by Question 26, an applicant exposes himself to the grave risk that screening officials will find him wanting in respect of the requisite beliefs and loyalties. The impermissible latitude of Rule 9406 as a criterion for exclusion, in conjunction with overintrusive probing for details about an applicant's associational affiliations, creates an obvious *in terrorem* effect on the exercise of First Amendment freedoms by law students and others. The interwoven complexity and uncertain scope of the scheme heighten the danger that caution and conscientiousness will lead to the forfeiting of rights by prospective Bar applicants. See *Keyishian* v. *Board of Regents, supra,* at 604. Appellees' attempt to save the whole scheme by restrictive construction of the Rule amounts, in my view, to little more than a declaration of beneficent intent, and we have said that good intentions "do not neutralize the vice" of vagueness and overbreadth. *Baggett* v. *Bullitt, supra,* at 373. The valid aims of appellees' screening efforts can be achieved without casting a pall on protected activity. But Question 26, viewed in light of Rule 9406, overreaches legitimate concerns and places an impermissible burden on the exercise of fundamental rights.

For the reasons stated I would strike down the portions of Rule 9406 discussed herein, as written and construed, and also Questions 26 and 27 (b). To that extent I would reverse the District Court.