**In re Matter of the ADMISSION PRO HAC VICE OF CHOKWE LUMUMBA to the Southern District of New York and the Permission for Chokwe Lumumba to Visit the Metropolitan Correctional Center.**

No. 81 Cr. Misc. # 1–pg.–47.

United States District Court,
S. D. New York.

Nov. 9, 1981.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for the U. S.; Stacey J. Moritz, and Jane W. Parver, Asst. U. S. Attys., New York City, of counsel.

Chokwe Lumumba, Edison, Lumumba & Ottison, Detroit, Mich., and National Conference of Black Lawyers, New York City, for Chokwe Lumumba; Alton H. Maddox, Jr., New York City, of counsel.

William M. Kunstler, Mark B. Gombiner, C. Vernon Mason, New York City, for Cynthia Boston.

New York Civil Liberties Union, for amicus curiae; Richard Emery, Steven R. Shapiro, New York City, of counsel.

IRVING BEN COOPER, District Judge.

Chokwe Lumumba, Esquire, a member of the Michigan Bar and a practitioner in its courts for many years but not admitted to practice in this Court, seeks an order permitting him to appear, initiate and pursue legal proceedings in this Court on behalf of his client, the defendant Fulani Sunni-Ali a/k/a Cynthia Boston. The Government opposes and has moved for an order precluding him from appearing *pro hac vice* and from entering the Metropolitan Correctional Center (MCC) for purposes related to this action.

We conducted an open hearing last Wednesday, November 4, 1981, received sworn testimony, exhibits, memoranda, etc., and reserved decision.

On November 5, 1981, on motion of the Government, the charges embraced in the complaint against the defendant were dismissed and she was released from the MCC. On the same day the Government served a subpoena on this defendant calling for her appearance before the Grand Jury on November 16, 1981. On November 6, 1981 United States Attorney Martin and Alton H. Maddox, Jr., Esq., attorney for Mr. Lumumba, appeared before us. They agreed that the matter before us was not moot, and they joined in an application that we continue with the proceedings inasmuch as Mr. Lumumba wished to appear in this Court because of the likelihood that application(s) to the Court might be made addressed to the subpoena aforementioned. Further, that Mr. Lumumba still seeks admission to MCC in order to protect his client.

\* \* \* \*

The defendant is already represented by two attorneys admitted to practice in this Court, William Kunstler, Esq. and C. Vernon Mason, Esq. They are of considerable experience in the conduct of criminal trials and their competency to represent the defendant adequately has not been questioned. No reason has even been mentioned why Mr. Lumumba should be added. The fact that the defendant, at the hearing before us last Wednesday, stated on the record that she wished Mr. Lumumba to serve as her chief counsel, with Messrs. Kunstler and Mason as associates with him, does not furnish an answer.

\* \* \* \*

From the highlights which the total record presents, especially the statements before us of Mr. Lumumba on and off the witness stand on November 4th, we select a demonstration of his values as a member of the legal profession. Before we proceed to do so, we observe that our estimate of his values also enables us to determine whether he should be precluded from MCC. We are satisfied, of course, that security reasons at the institution warrant the exercise of strict precautions.

The proof adduced before us on November 4th, coupled with all the proceedings heretofore had herein and made a part of the instant proceeding, establishes that the defendant and Mr. Lumumba, in addition to his activity as a lawyer, have been since 1968 members of the Provisional Government of the Republic of New Africa (RNA). He has held various offices in that organization including Acting President and presently Midwest Vice President.

In a written report dated July 9, 1976 issued by the Department of Justice (defendant's exhibit B) and offered in evidence by counsel for Mr. Lumumba at the hearing on November 4th to prove that RNA was not a terrorist organization—in effect the report so concluded—but now so charged by the Government, recites the origin and history of RNA. It includes:

The RNA was founded at Detroit, Michigan, on March 31, 1968, ... The stated purpose of the RNA was to separate the states of Alabama, Georgia, Louisiana, Mississippi, and South Carolina from the United States to form an 'African Republic' and to relocate black people to these states. Initially, the RNA has stated that if the Government does not give the five states to the RNA, the organization will be 'forced into a war' with the United States.

We find further that in 1977 or 1978 Mr. Lumumba as "Acting President, Provisional

Government Republic of New Afrika" issued, and caused to be distributed, a statement (Government exhibit 4) which in part reads:

> We must take our land, and win our independence ultimately by force. We believe the majority of Us, that New Afrikans must overturn the governments and powers which currently control our national territory, and any other portion of land which is to be independent. We realize that essentially it is the illegal struggle, the the [sic] struggle which is illegal by United States law, which will win our independence.

After carefully examining in our presence exhibit 4 in its entirety (28 pages), Mr. Lumumba testified: "I authored a similar document, and I don't know if I authored this one, but I authored a similar document." [1]

It should be noted that before Magistrate Tyler on November 2, 1981, Mr. Lumumba stated the Government's charges that RNA was a terrorist organization "are absolutely without basis and I would challenge the U. S. Attorney in this case to come forth with some type of affirmative proof." [2]

\* \* \* \*

Especially in light of the considerable comments by Mr. Lumumba last Wednesday on and off the witness stand, we are compelled to observe that the total record before us forces the conclusion that one of the clear purposes of Mr. Lumumba's application is to enable him, if authorized to represent the defendant here, to carry on a propaganda campaign much beyond the limits of proper representation of a client.

\* \* \* \*

From a plethora of authority presented to us, we select the following portions of legal opinions which we regard most closely applicable to the total material before us, especially the court reporter's minutes of November 4, 1981:

### 1.

Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.
*Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)

### 2.

In *Law Students Research Council v. Wadmond*, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971) plaintiffs were challenging the procedure for admission to the bar of the State of New York which requested them to answer a question:

> 26. (a) Have you ever organized or helped to organize or become a member of any organization or group of persons which, during the period of your membership or association, you knew was advocating or teaching that the government of the United States or any state or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means?—If your answer is in the affirmative, state the facts below.

The Supreme Court rejected the argument that such an inquiry was an unconstitutional inquiry into the applicant's associations stating:

> Our cases establish that inquiry into associations of the kind referred to is permissible under the limitations carefully observed here. *We have held that knowing membership in an organization advocating the overthrow of the Government by force or violence, on the part of one sharing the specific intent to further the organization's illegal goals, may be made criminally punishable. Scales v. United States*, 367 U.S. 203, 228–230, 81 S.Ct. 1469, 1485–1486, 6 L.Ed.2d 782.

\* \* \* \*

---

1. Minutes of Hearing, November 4, 1981, p. 63.

2. Minutes of Hearing, November 2, 1981, p. 17.

Surely a State is constitutionally entitled to make such an inquiry of an applicant for admission to a profession dedicated to the peaceful and reasoned settlement of disputes between men, and between a man and his government. The very Constitution that the appellants invoke stands as a livinĝ embodiment of that ideal. (emphasis added)

### 3.

Of course, admission to the Bar of one state does not carry with it the right to practice law anywhere else.... The same is true of admission to the district courts of the United States.... *Just as with a regularly admitted attorney, one seeking admission pro hac vice is subject to the ethical standards and supervision of the court.*
In re Rappaport, 558 F.2d 87, 89 (2d Cir. 1977) (emphasis added) (footnote and citations omitted)

\*　　\*　　\*　　\*

Government's application granted. Defendant's motion denied. We are constrained to, and do, deny Mr. Lumumba's application for admission *pro hac vice* and preclude him from the Metropolitan Correctional Center.