CONTICO INTERNATIONAL, INC., Continental Sprayers, Inc., Continental Sprayers De Mexico, S.A. De C.V., Victor Manuel Gandara Martinez, Richard Harris, and John E. Weibert, Relators,

v.

Hon. Javier ALVAREZ, Judge of the County Court at Law No. Three of El Paso County, Respondent.

No. 08–95–00060–CV.

Court of Appeals of Texas, El Paso.

Aug. 3, 1995.

Timothy L. White, Ray, McChristian & Jeans, P.C., El Paso, for relators.

James F. Scherr, Scherr & Legate, P.C., Javier Alvarez, Sam J. Legate, Scherr & Legate, P.C., El Paso, for respondent.

Mara Asya Blatt, El Paso, real party in interest.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

BARAJAS, Chief Justice.

The opinion dated July 13, 1995 has been withdrawn and the following is the opinion of this Court.

Relators Contico International, Inc., Continental Sprayers, Inc., Continental Sprayers De Mexico, S.A. De C.V., Victor Manuel Gandara Martinez, Richard Harris, and John E. Weibert seek a writ of mandamus to compel the Honorable Javier Alvarez, Judge of the County Court at Law No. Three of El Paso, County, Texas, to vacate an order denying Relators' motion to disqualify James F. Scherr ("Scherr") and the law firm of Scherr & Legate, P.C. ("Scherr & Legate") from

representing the plaintiffs in current pending litigation. Relators further seek to compel the trial court to substitute an order disqualifying Scherr and Scherr & Legate. We conditionally grant Relators' petition for writ of mandamus.

## I. SUMMARY OF THE EVIDENCE

Scherr represents the plaintiffs in the civil suit underlying this mandamus proceeding. In the course of representation, he was effectively accused of stealing Relators' investigation file. The accusation first came at a discovery hearing, and after it was made, Scherr offered no response. He instead left the courtroom still in possession of the file, despite having been repeatedly asked to submit it to the trial court for inspection. Relators sought sanctions, and a hearing was convened at which time Scherr appeared in person and through counsel. When called as a witness and asked precisely what he possessed and how he obtained it, Scherr refused to answer, claiming that to do so would expose him to criminal liability. We elaborate below.

The record reflects that Ricardo Acosta, an investigator employed with Litigant Services, Inc., investigated the facts of the underlying suit on behalf of the defendants' counsel, Ray & McChristian, P.C. Joe Garcia was also involved in the investigation. Garcia is the owner of Litigant Services, Inc. Litigant Services provided the results of the investigation to Ray & McChristian in the form of an investigative report bound in a black notebook along with a copy of a videotape (collectively the "File"). The defendants claimed attorney/client, investigative, and party communication privileges in the contents of the File. Scherr, on behalf of the plaintiffs, filed a motion to compel the production of parts of File. Ray & McChristian properly tendered their copy of the File to the trial court for an in camera inspection so that it could determine which, if any, parts of the File were discoverable.

On February 16, 1995, the trial court held a hearing to determine whether portions of the File were discoverable, and to determine whether the plaintiffs could depose Ricardo Acosta. Joe Garcia and Ricardo Acosta were to testify on behalf of the defendants at the hearing to establish privilege. The record shows that Garcia had previously discovered that his copy of the File was missing from his office. Garcia's copy contained not only the notebook and videotape, but also correspondence between Litigant Services and Ray & McChristian about the investigation and strategy. Garcia was not immediately concerned because he thought the File was merely misplaced.

When Garcia appeared at the February 16 hearing, however, he and Acosta observed Scherr in possession of what appeared to be a copy of their File. Scherr appeared to be structuring his cross-examination of Acosta from the copy of the missing File. Carlos Rincon, the Ray & McChristian attorney representing the defendants at the February 16 hearing, objected to the proceedings as soon as he learned that Scherr appeared to be in possession of the missing file. Rincon immediately made the trial court aware of the possible discrepancy. He further requested that the trial court sequester Scherr's notebook and videotape in order to compare it, in camera, with the notebook and videotape Ray & McChristian had previously tendered in camera. Rincon offered to have Garcia and Acosta testify to establish good cause to sequester the notebook and videotape. The trial court refused to do so absent the filing of a proper motion and a request for a hearing.

The record is devoid of any response from Scherr. It is clear, however, that Scherr took the disputed file and videotape from the courtroom on February 16, despite Rincon's pleas to the contrary. Garcia filed criminal charges against Scherr on February 16, 1995. It is further clear from the record that Scherr never personally tendered the disputed materials to the trial court, but rather, tendered the disputed materials to the trial court through counsel.

The defendants filed a motion for sanctions and for disqualification of Scherr, as well as Scherr & Legate on the ground that Scherr had obtained possession of the defendant's privileged materials in violation of the Texas Disciplinary Rules of Professional Conduct. The trial court conducted a hearing on the

defendants' motion on February 22, 1995 at which time Scherr appeared in person and through counsel. When asked where he had obtained the disputed report and videotape, and whether they were copies of the report and videotape prepared for Ray & McChristian by Litigant Services, Scherr invoked his rights under the Fifth Amendment to the United States Constitution, electing not to incriminate himself.[1]

Both Garcia and Acosta testified at the February 22 hearing. Specifically, Garcia testified that, at the February 16 hearing, he noticed Scherr in possession of a black notebook similar to the ones Litigant Services used to bind reports for their clients. Garcia noticed Litigant Services letterhead inside the notebook, and recognized some of Scherr's questions as information contained in Litigant Services' report to Ray & McChristian. Acosta observed Scherr in possession of a videotape that appeared to be the identical videotape he had prepared as part of the File. Acosta noticed that the label on the videotape was in his own wife's handwriting, and that it matched the label on the videotape he had personally prepared. The videotape was played at the hearing. Acosta noticed that a mistake he had made in copying the videotape, which caused a few seconds of a Mexican television newscast to appear on the tape, was likewise on the videotape in Scherr's possession. Acosta testified that while Scherr may have been able to get a copy of the videotape from another source, the copy Scherr had must have been obtained from Litigant Services. Acosta further testified that he had accidentally created the flaw, which would only be found on copies of the videotape made from Litigant Services' copy. The trial court issued an order on February 22 denying all of the defendants' requested relief. Defendants, as Relators, filed this original proceeding in mandamus.

## II. DISCUSSION

### A. A LAWYER'S DUTY

Lawyers occupy a singularly lofty position in the political and judicial fabric of the Unit-ed States. And with good reason. This is, after all, a nation of laws. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) (opinion by Marshall, C.J.). It is not surprising, then, that lawyers comprise a disproportionate percentage of the state and national bodies that write, amend, and repeal the laws by which we govern ourselves. They are exclusively entrusted with the responsibility of prosecuting those who violate our criminal laws, and they alone may seek redress in court for those who find themselves civilly aggrieved. In both instances, lawyers defend those accused of wrongdoing. They preside over the formal proceedings intended to effect justice and, not infrequently, actually sit in final judgment of the matters at issue.

The variety of the roles undertaken and the gravity of the issues addressed by lawyers necessarily contributed to the development of the law as a noble and dignified profession. An honest and ethical lawyer has long been part of the foundation for the historically elevated and well-deserved role lawyers have played in our culture. Among the accomplices of the honesty and ethics expected of a lawyer is the required detachment from both the passions of politics and the ever-changing state of popular opinion. In the definitive treatise on developing American democracy, Alexis de Tocqueville recognizes that lawyers' "habit of directing ... blind passions ... toward the objective gives them a certain scorn for the judgment of the crowd." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 243–44 (J.P. Mayer & M. Lerner eds. 1966), *quoted in* Geoffrey C. Hazard, Jr., *The Future of Legal Ethics*, 100 YALE L.J. 1293, 1269 (1991). Those who practice law must remain far from, or at least above, the maddening crowd. While litigants, voters, and other political and social actors pursue their various and changing interests, the lawyer remains in equilibrium. The lawyer must be steadfastly committed both to the client and, more importantly, to the law itself.

---

1. Although not germane to **where** he had obtained the notebook and videotape, or whether they were copies of the report and videotape prepared by Litigant Services, Inc., Scherr claimed investigative and attorney/client privileges as well.

**34**

We recognize that the tenor of current public rhetoric undermines our thesis that lawyers comprise an elite body essential to democracy itself.[2] We further recognize that lawyers have earned both the scorn and admiration of the public.[3] Assuming that the two most prevalent complaints are insatiable greed and broad amorality, we are generally satisfied with the common responses to them. With respect to the first, one commentator has observed that "[a]varice does not seem to distinguish lawyers from businessmen or architects or doctors." Post, *supra* note 5, at 380. With respect to the second, we think it largely a product of the single-minded devotion to client that is an undeniable virtue of the profession. Further, we content ourselves with the knowledge that criticism of the law and its practitioners is neither new[4] nor newly intensified.[5] We cannot escape, however, that the noble barrister seems more and more the quaint vestige of a bygone era. If Scherr is representative, lawyers stray increasingly far from those ideals that were once the credo of the calling, along the way providing fodder for those who make our collective devolution the butt of cultural humor, instead of recognizing it for the bellwether of democratic decay that it is. Whether cause or consequence, this slow slide into barbarism is accompanied by a torrent of indiscriminate public criticism that characterizes the law and its practitioners as incompatible with a just society. To the extent that Scherr's conduct contributes to this disintegration, we shall end it.

## B. THE IMPORT OF DUTY

■ It is axiomatic that, as an integral part of our system of government, the legal system depends on the relationship between Bench and Bar. Hence, the traditional characterization of lawyers as "officers of the courts." *See Bates v. State Bar*, 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977) ("lawyers are essential to the primary governmental function of administering justice"). Lawyers, then, owe to the courts duties of scrupulous honesty, forthrightness and the highest degree of ethical conduct. Their many and varied factual representations to a court frequently control the course of litigation and the ultimate disposition of the rights involved. How, for example, is a court to efficiently determine whether service was properly effected when the issue is raised? How is a trial court laudably engaged in aggressive case management to accurately assess prospects for pretrial settlement than by relying on the lawyers' representations about the matter? The point is capable of expansion, but it here suffices to point out that courts frequently must rely on a lawyer's word, and weighty consequences often turn thereon. When facts conspire to cast doubt on that word, the court is empowered, if not required, to investigate the lawyer's performance of the sacred office, quite apart from the interests of the client, and

---

2. One need not venture very far to discover, with disdain, judges playing fast and loose with their judicial and ethical obligations or lawyers libeling and slandering the very ones entrusted to dispense justice, thereby impugning the system they have sworn to protect and preserve. *See In re Thoma*, 873 S.W.2d 477 (Tex.Rev.Trib.1994); TEX. DISCIPLINARY R. PROF. CONDUCT 8.02(a) (1995), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Vernon Supp.1995).

3. A survey by the National Law Journal found that lawyers were most admired for their devotion to their clients and their ability to "cut through bureaucratic red tape," and simultaneously most disliked for employing the legal system for their clients' ends without regard to the greater good. *What America Really Thinks About Lawyers*, NAT'L L.J., Aug. 18, 1986, at s-3, *cited in* Robert C. Post, *The Popular Image of the Lawyer*, CAL.L.REV. 379, 380 (1987). "Lawyers, it seems, can't win for trying." Post, *supra*, at 380.

4. The obvious example, notwithstanding the author's intent, is the scheming of Shakespeare's butcher in Henry VI, *see* WILLIAM SHAKESPEARE, THE SECOND PART OF KING HENRY THE SIXTH act 4, sc. 2, although Luke long ago reported a similar, if more disturbing, indictment, *see* Luke 11:46 ("Woe unto you also, ye lawyers! for ye lade men with burdens grievous to be borne ...," *quoted in* Post, *supra* note 5, at 379).

5. The vitriol modern culture heaps upon lawyers seems flattering in comparison to Coleridge's seethingly venomous, turn-of-the-century verse:

> He saw a Lawyer killing a Viper
>     On a dunghill hard by his own stable;
> And the Devil smiled, for it put him in mind
>     Of Cain and his brother Abel.

SAMUEL TAYLOR COLERIDGE, *The Devil's Thoughts*, in COMPLETE POETICAL WORKS 320 (1912), *quoted in*, Post, *supra* note 3, at 379 n. 3.

either on its own or incident to a party's similar inquiry, though the latter is obviously differently motivated.[6] And when a lawyer frustrates such properly limited investigation, certain consequences must follow.

## C. RULE 1.09: CONFIDENTIAL INFORMATION

■ The Texas Disciplinary Rules of Professional Conduct do not directly address a situation such as this where counsel is accused of improperly appropriating and using the confidences of an opposing party. Rule 1.05 prohibits a lawyer from revealing the confidential information of a client or former client. TEX. DISCIPLINARY R. PROF. CONDUCT 1.05 (1991), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Vernon Supp. 1995). Rule 1.09 prohibits a lawyer from representing a client against a former client if it appears that the representation in reasonable probability will involve a violation of Rule 1.05. TEX. DISCIPLINARY R. PROF. CONDUCT 1.09 (1991). Thus, a lawyer is clearly prohibited from continuing with a representation when the lawyer has knowledge of the opposing party's confidences by virtue of a previous representation if those confidences are relevant to the current representation.

### 1. Did Scherr Violate this Duty?

■ In this case, the confidences at issue are the results of the defendants' investigation of the facts underlying the lawsuit. The confidences, therefore, are clearly relevant to the current representation as contemplated by the disqualification provisions of Rules 1.05 and 1.09. Further, confidential information protected by Rules 1.05 and 1.09 includes confidential communications as de-fined by Texas Rule of Civil Evidence 503. TEX. DISCIPLINARY R. PROF. CONDUCT 1.05(a)(1991). Rule 503 defines a communication as confidential if it is "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." TEX.R.CIV.EVID. 503. We find that the investigation file at issue fits the description of confidential information.

■ In this case, however, Scherr never represented Relators; rather, he is accused of gaining Relators' confidential information through improper means. As noted above, this situation is not addressed by the current Disciplinary Rules of Professional Conduct.[7] Nonetheless, we find that if it is misconduct for a lawyer to continue a representation when the lawyer has gained confidences of the opposing party through a former representation, it is likewise misconduct to continue a representation when a lawyer has gained confidences of the opposing party through theft, deceit, inadvertent disclosure or other means. The Rules clearly intend that a party's confidences, however gained, not be used against them.

■ Scherr correctly reminds this Court that the evidence of wrongdoing against him at the February 22 sanctions hearing was conflicting. He claims that the trial court was within its discretion in refusing to disqualify him because the evidence adduced at the hearing did not establish wrongdoing beyond all doubt. To be sure, there exists more than a mere scintilla of evidence that would indicate Scherr did no wrong.[8] In the

---

6. *See and compare* TEX.CODE JUD.CONDUCT, Canon 3D(2)(1994), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G., app. B (Vernon Supp.1995) *with Cap Rock Elec. Coop. v. Texas Utilities,* 874 S.W.2d 92 (Tex.App.—El Paso 1994, no writ).

7. Canon Nine of the former Texas Code of Professional Responsibility required a lawyer to avoid even the appearance of impropriety. Under Canon Nine, a lawyer could be disqualified from a representation if the lawyer's actions created the appearance of impropriety. It appears, for reasons discussed above, that Canon Nine would have been applicable to this situation. Although the current Rules, effective since Janu-

ary 1, 1990, do not include an identical prohibition, the spirit of Canon Nine survives to a limited extent in Rule 8.04. *See infra* Part C.

8. In *Henry S. Miller Co. v. Hamilton,* 813 S.W.2d 631 (Tex.App.—Houston [1st Dist.] 1991, no writ), it was noted that two scholars recently devised a definition of a scintilla:

"Scintilla" means literally a trace or a spark. It may be worth noting that Scintilla was the name of a reveller in the debauches described by Petronius in *The Satyricon.* Then again, it may not.

W. Powers & J. Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.

area of use of an opposing party's confidences, however, there is no need to show actual wrongdoing, or even actual use of the confidential information, in order to disqualify counsel from the representation. We apply by analogy the cases interpreting Rules 1.05 and 1.09.

### 2. Disqualification Does Not Require Proof of Actual Wrongdoing

The Texas Supreme Court has adopted a standard requiring disqualification whenever counsel undertakes representation of an interest that is adverse to that of a former client, as long as the matters embraced in the pending suit are "substantially related" to the factual matters involved in the previous suit. *Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 833 (Tex.1994); *NCNB Texas Nat'l Bank v. Coker,* 765 S.W.2d 398, 399–400 (Tex.1989). This strict rule is based on a conclusive presumption that confidences and secrets were imparted to the attorney during the prior representation. *Coker,* 765 S.W.2d at 400.

The rule has been applied mainly in the context of a single attorney or firm representing two clients with adverse interests. *See, e.g., Clarke v. Ruffino,* 819 S.W.2d 947, 951 (Tex.App.—Houston [14th Dist.] 1991, orig. proceeding, writ dism'd w.o.j.); *Insurance Co. of North America v. Westergren,* 794 S.W.2d 812, 814 (Tex.App.—Corpus Christi 1990, orig. proceeding); *Howard v. Texas Dep't of Human Servs.,* 791 S.W.2d 313, 315 (Tex.App.—Corpus Christi 1990, no writ); *Home Ins. Co. v. Marsh,* 790 S.W.2d 749, 754 (Tex.App.—El Paso 1990, orig. proceeding). The analysis has also been applied in the context of a lawyer moving from one firm to another when the two firms represent opposing parties in ongoing litigation. *Petroleum Wholesale, Inc. v. Marshall,* 751 S.W.2d 295 (Tex.App.—Dallas 1988, orig. proceeding). In that context, the Supreme Court has accepted a second conclusive presumption: that an attorney who has obtained confidential information shares it with other members of the attorney's firm because of the interplay among lawyers who practice together. *Phoenix Founders,* 887 S.W.2d at 834 (citing *Petroleum Wholesale,* 751 S.W.2d at 299).

Although the former attorney will not be presumed to have actually revealed the confidences to the present client, the trial court should perform its role in the internal regulation of the legal profession and disqualify counsel from further representation in the pending litigation. *See NCNB Texas Nat'l Bank,* 765 S.W.2d at 400. This remedy is designed to protect the litigants and the public alike. Thus, an attorney's action in moving from one firm to another, or in representing one client in succession to another, although not improper actions, can create the presumption of conduct prohibited by Rules 1.05 and 1.09.

We find that on these facts Scherr's actions have created a similar presumption of possession of confidences of the opposing party in the pending litigation. At the February 16 discovery hearing, when accused of effectively stealing opposing counsel's file, Scherr had the opportunity, but simply refused, to give the disputed documents to the trial court for an in camera inspection. Scherr was in complete and absolute control of the action at that point. There had been no criminal charge lodged against him. He could have easily turned "his" documents over to the trial court without waiving any privileges he claimed in them, the trial court's contrary statements notwithstanding. Presumably, the trial court's review of both files together on February 16 would have conclusively decided the issue before it became a conflict situation. Scherr chose, however, to leave the courtroom with the disputed documents and without making any effort whatsoever to respond to the serious allegations leveled against him. His actions at that point began to create a presumption against him. "Silence gains ... probative weight where it persists in the face of accusation." *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d

---

L.Rev. 515, 521 n. 15 (1991). The Oxford English Dictionary (2d ed. 1989), defines scintilla as Latin for a spark, a minute particle, or an atom.

*Henry S. Miller Co. v. Hamilton,* 813 S.W.2d at 634 n. 2.

99 (1975). Where a definite statement of a matter of fact is made in the presence or within hearing of a party so that the statement is understood, and the statement is of such a nature as to call for a reply, the statement and a total or partial failure to reply render it permissible to presume a concession of the truth of the facts stated. *Dodd v. Harper,* 670 S.W.2d 646, 650 (Tex. App.—Houston [1st Dist.] 1983, no writ).

■ Further, Scherr chose to invoke the Fifth Amendment at the sanctions hearing. Although by the time of that hearing, Garcia had filed criminal charges against Scherr, Scherr's invocation of the Fifth Amendment in a civil proceeding invites an adverse presumption. The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances. *Brink's, Inc. v. City of New York,* 717 F.2d 700, 710 (2d Cir.1983); *East Coast Novelty Co. v. City of New York,* 842 F.Supp. 117, 121 (S.D.N.Y. 1994). Accordingly, given Scherr's status as an officer of the court, we find that an adverse presumption may be drawn from Scherr's concern for his potential criminal liability that the allegations against him of having improperly acquired opposing counsel's notebook.

■ As in the cases interpreting Rules 1.05 and 1.09, we need not determine whether Relators' confidences were actually obtained by Scherr nor find that he is actually guilty of improperly obtaining the notebook and the videotape in order to find that he should be prohibited from representing the plaintiffs against Relators in this lawsuit. We do not necessarily find that Scherr has actually committed misconduct. We find that Scherr's actions create a permissible presumption that Scherr is in possession of Relators' confidences. We hold that these presumptions, which are merely permissible in other areas of the law, should be applied conclusively in the area of the ethical conduct of the legal profession when such conduct directly impacts on the relationship of a lawyer, as an officer of the court, and the bench. This conclusive application is similar to the conclusive application of the presumptions in the case law interpreting Rules 1.05 and 1.09. Applying the body of law interpreting Rules 1.05 and 1.09 by analogy, we find that Scherr cannot continue to represent the Plaintiffs in this case when he is presumed to be in possession of Relators' confidences.

With respect to a lawyer who is not otherwise a party to litigation, we find it indefensible to claim the right not to be incriminated if the inquiry is limited to questions that concern litigation-related conduct. Such questions should always yield benign answers, or at the very minimum answers that protect or further the interests of the client. The presumption we today announce is not based on the truth or falsity of the allegations against Scherr and requires no final determination of the information he possessed or how he obtained it. It is merely a prophylactic ethical rule the onus of which can be obviated with minimal honest and ethical effort. Scherr should have been motivated to speak when faced with allegations of gross misconduct. The record establishes that he did not.

## D. RULE 8.04: CRIMINAL OR DISHONEST CONDUCT; OBSTRUCTION OF JUSTICE

We note once again that the Disciplinary Rules of Professional Conduct do not directly address the circumstance where a lawyer is accused of possessing potentially disqualifying information and, effectively, of stealing it. Neither do the Rules address a lawyer's failure to respond to such squarely leveled allegations. Rule 8.04, however, expresses the noble ethos of the profession by proscribing a variety of unseemly conduct. The Rule prevents a lawyer from directly or vicariously violating other disciplinary rules, from committing a criminal act that reflects adversely on one's honesty, trustworthiness, or fitness as a lawyer, from engaging in conduct that involves dishonesty, fraud, deceit, or misrepresentation, and from engaging in conduct

that constitutes obstruction of justice. TEX. DISCIPLINARY R. PROF. CONDUCT 8.04 (1994). These proscriptions are admittedly broad and may not specifically bar the conduct involved in the instant case. They are broad by necessity. The diversity of the human experience and the innumerable legal permutations in which it results do not readily lend themselves to identification by verbal formulae. This difficulty does not, however, insulate a lawyer from the consequences of undesirable, but factually complicated, conduct. To allow it to do so would actually encourage the unethical lawyer to go to greater lengths to disguise wrongdoing because the lawyer would thereby not only make the conduct more difficult to detect but would actually render it objectively less likely to fall within the necessarily inexhaustive text of the Rules.

### 1. Did Scherr Breach This Duty?

■ To the extent we have already determined Scherr's continued representation of his clients violates Rule 1.09, it certainly runs afoul of Rule 8.04's overlapping prohibition of knowing violations of other disciplinary rules. Moreover, the precise conduct of which he was accused, outright thievery of a confidential investigation file, is clearly encompassed by the Rule's laundry list of prohibitions of what is, at base, intolerable conduct for an officer of the court. Theft comes within Rule 8.04's proscription of criminal, dishonest, and like conduct.

Further, Scherr's failure to respond to the repeated allegations of improper conduct did obstruct justice. The ultimate questions at the sanctions hearing were **whether** and **how** Scherr obtained the opposing party's investigation file. Scherr did not respond to the allegations when they were initially raised at the discovery hearing. He should have done so. Worse, instead of appearing at the later sanctions hearing prepared to explain himself, Scherr expressly refused to answer the relevant questions. This, too, was wrong and offended the most fundamental concepts that relate to the proper administration of justice.

### 2. The Remedy: Sanctions

Relators sought the imposition of a variety of sanctions, claiming that Scherr illicitly ob-

tained the disputed investigation file and offering much proof to this effect. The trial court apparently disbelieved the allegations of wrongdoing and imposed no sanction. To the extent that the trial court did not find **actual** wrongdoing, we do not disturb this determination. The record is clear, however, that Scherr stonewalled all investigation into what should have been a benign issue. Given Scherr's role as an officer of the court, he had a duty to account for the use of his office.

Texas Rule of Civil Procedure 215 provides for the imposition of sanctions on parties who abuse the discovery process. In *Cap Rock Elec. Coop. v. Texas Utilities*, 874 S.W.2d 92 (Tex.App.—El Paso 1994, no writ), we recently held that Rule 215 is broad enough to allow for the sanctioning of lawyers who engage in trickery and deceit in the course of representing a client. Indeed, we held that "[s]anctions imposed to deter such abominable conduct are not only permissible, they are mandatory." *Id.* at 98. Although the sanctioned lawyers in *Cap Rock* were technically sanctioned for the failure to comply with a specific discovery order, they did not altogether fail to do so. The trial court ordered them to produce certain documents, and they complied. But they misrepresented the nature of the documents they produced, faxing some of them back and forth between offices to alter their appearance. The changes were critical to the case as a whole. Moreover, the conduct that effected them is the very sort that causes Bench, Bar, and public alike to lament the perceived depravity of our legal system. At the very least, lawyers should be honest. Thus, in *Cap Rock*, the sanctions were more a product of the lawyers' efforts to mislead the trial court and opposing parties than of their technical noncompliance with a discovery order. A similar rule applies to Scherr's conduct.

■ The instant dispute arose at a discovery hearing. The ensuing sanctions hearing was a direct outgrowth of a discovery dispute. Although Scherr had yet to be ordered to produce the investigation file or explain his possession of it, the trial court implicitly condoned some inquiry into the

matter by holding a hearing on it and by allowing Relators to call Scherr as a witness. When Scherr thwarted all legitimate efforts to discover whether he had faithfully performed the duties of his office by invoking his privilege against self-incrimination, he invited the court's contempt no less than one who engages in trickery and deceit. Neither species of conduct will be tolerated by the Courts of this State, and both require a sanction to discourage similar conduct in the future.[9]

We are, of course, unable to impose a sanction of our own choosing. We determine only that some sanction is required and leave it to the discretion of the trial court to select the form it will take.

### E. THE FIFTH AMENDMENT

We recognize that Scherr's invocation of his Fifth Amendment right not to incriminate himself poses certain difficulties for our conclusion that he must be disqualified from continued representation in this case and our conclusion that the trial court must impose some sanction. It is relevant, although not essential to the former, and it is an integral part of the analysis by which we reach the latter. A line of United States Supreme Court cases sheds light on the matter, and reveals that because both the inquiry in which the invocation arose and our use of it are limited to the context of Scherr's ethical exercise of the public trust as an officer of the court, and is followed by minor, merely personal consequences, it is entirely permissible.

### 1. Principles

In *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), several police officers were questioned by the district attorney in the course of an investigation into a traffic fixing scheme. Before questioning, the officers were told that their answers could be used against them in any subsequent criminal proceeding and that, although they had the right to refuse to answer, a New Jersey statute mandated their termination if they did so. *Id.* at 494, 87 S.Ct. at 617. The officers spoke, and their statements were later used against them to obtain the convictions that were the subject of the appeal. *Id.* at 495, 87 S.Ct. at 617–18. Finding that the officers were given the choice either to forfeit their jobs or to incriminate themselves, the Court agreed with the officers that the statements produced by the choice were involuntary and therefore inadmissible against them. *Id.* at 497–98, 87 S.Ct. at 618–19.

In *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), decided the same day as *Garrity*, a New York attorney appealed his disbarment for the sole reason that he refused to testify and produce certain records in the course of a disciplinary proceeding against him. The controlling plurality expressly overruled a previous case to the contrary and held that disbarment and the consequent loss of livelihood were too high a price to place on the exercise of the Fifth Amendment privilege. *Id.* at 516, 87 S.Ct. at 628–29. Although the Court found "no room in the privilege against self-incrimination for classifications of people so as to deny it to some and extend it to others," *id.*, it expressly reserved the question "[w]hether a policeman, who invokes the privilege when his conduct as a police officer is questioned in disciplinary proceedings, may be discharged for refusing to testify," *id.* at n. 3. Two well-reasoned dissents reached contrary conclusions because they found the principles supporting the privilege inapplicable to state efforts to police the ranks of the Bar. *Id.* at 520, 87 S.Ct. at 630–31 (Harlan, J., dissenting); *Garrity v. New Jersey*, 385 U.S. 493, 530, 87 S.Ct. 616, 636, 17 L.Ed.2d 562 (1967) (White, J., dissenting in both *Garrity* and

---

9. We emphasize that the sanction results **exclusively** from Scherr's obstruction and is entirely unrelated to the trial court's apparent conclusion that he did not actually steal the investigation file. Thus, it is consistent to penalize Scherr's **obstruction** while leaving undisturbed the trial court's assessment of the truth or falsity of the allegations of theft. In that regard, this Court is not unmindful of the recent decision of the Texas Supreme Court in *Texas Department of Public Safety Officers Assn. v. Denton*, 897 S.W.2d 757 (Tex.1995). We find the present case distinguishable in that *Denton* involved a party-litigant exercising the privilege against self-incrimination, while this case clearly did not.

*Spevack* in a single separately published opinion). One also criticized the plurality for the broad preemptive sweep of its decision, reasoning that the lawyer had yet to incriminate himself by speaking and correctly far-seeing that to void the disbarment despite this failure would "frustrate in advance" any investigation of misconduct by effectively barring all inquiry into the matter. *Garrity,* 385 U.S. at 531, 87 S.Ct. at 531 (White, J., dissenting).

Apparently not entirely satisfied with *Garrity* and *Spevack,* the Supreme Court twice revisited this issue in the following term. In *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), a New York police officer was summoned by a grand jury investigating police corruption. The officer was asked to waive his Fifth Amendment protections by waiving any immunity that may attach to his testimony, refused, and was discharged solely for this refusal pursuant to a city ordinance that required discharge for the refusal to testify or the refusal to waive the privilege against self-incrimination. *Id.* at 274–75, 88 S.Ct. at 1914. The *Gardner* Court was careful to distinguish the issue in *Garrity,* the attempted use of compelled testimony, from the issue before it, whether one may be discharged for exercising a constitutionally guaranteed right. *Id.* at 277, 88 S.Ct. at 1915–16. Finding this issue more akin to *Spevack,* the Court held that the officer could not be fired simply for holding fast to what the Constitution gave him. *Id.* at 278, 88 S.Ct. at 1916. Interestingly, the Court took the opportunity to expand on its *Spevack* allusion to a police officer questioned about his own official duties by pointing out that the privilege would not have barred the officer's dismissal had his silence persisted in the face of questions "specifically, directly, and narrowly relating to the performance of his official duties." *Id.* Thus, had the officer not been required to waive his constitutional· rights beforehand, he could have been fired simply for refusing to answer questions about the performance of his official duties. *Id.* The Court also distinguished *Spevack* by emphasizing a police officer's undivided loyalty to the state, as opposed to what the Court characterized as a lawyer's loyalty only to his client. *Id.* at 277–78, 88 S.Ct. at 1915–16. The Court failed altogether to address a lawyer's similar duties to the Courts and to the legal system as a whole.

In *Uniformed Sanitation Men Assoc. v. Commissioner of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), the issue alluded to in *Spevack* and expanded on in·*Gardner* was refined and further elaborated upon. The New York Sanitation Commissioner sought to question several sanitation workers in connection with a corruption investigation. *Id.* at 281, 88 S.Ct. at 1918. Each was informed that refusal to testify about his official duties would result in termination in accordance with a city ordinance. *Id.* at 281–82, 88 S.Ct. at 1918–19. Most refused to testify and were discharged for doing so. *Id.* at 282, 88 S.Ct. at 1918–19. Some testified, were suspended, and were later summoned by a grand jury and asked to waive their immunity. *Id.* When they refused, they were dismissed in accordance with the city ordinance, which also provided for discharge for the failure to waive immunity from prosecution. *Id.* The Court found the ordinance significant because it revealed that the employees were fired merely for refusing to relinquish that which the Constitution gave them. *Id.* at 284, 88 S.Ct. at 1919–20. The overt request to waive criminal immunity and the express warning that their answers could be used against them in subsequent criminal proceedings also supported this conclusion. As in, *Garrity* and *Gardner,* the Court found that the sanitation men were presented with the unconstitutional choice between continued employment and the benefit of the Constitution. *Id.* at 283, 88 S.Ct. at 1919. The Court made clear, however, that the workers could have been properly fired had the scope of the proceedings been limited to inquiry into the performance of their official duties. *Id.* at 284, 88 S.Ct. at 1919–20. The refusal to account for the performance of their public trust would alone have supported discharge, and the workers' dismissals were infirm only because the inquiry into their conduct exceeded this scope because it involved requests for broad Fifth Amendment waivers and contemplated criminal prosecution.

In a concurring opinion, two justices pointed out that *Gardner* and *Sanitation Men* constitute a step back from *Garrity* and *Spevack*. *Gardner,* 392 U.S. at 285, 88 S.Ct. at 1920 (Harlan, J., concurring in both *Gardner* and *Sanitation Men* in a single separately published opinion). Apparently seizing on the elaboration of the "narrow inquiry" language that was new in *Spevack,* the concurring justices noted that despite the majority's attempts to distinguish *Garrity* and *Spevack* from *Gardner* and *Sanitation Men,* they found in this series of cases "a procedural formula whereby, for example, public officials may now be discharged and lawyers disciplined for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices," and that this formula is "a welcome breakthrough in what *Spevack* and *Garrity* might otherwise have been thought to portend." *Id.* As the concurrence correctly perceived, the Fifth Amendment landscape was still unclear.

In *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), two New York licensed architects were summoned by a grand jury investigating criminal activity and were put to a choice similar to the choice faced by the employees in *Gardner* and *Sanitation Men.* They were asked to waive their immunity and, after they refused, authorities notified various state contracting authorities that, under state law, their refusal disqualified them from work on all public contracts. *Id.* at 75–76, 94 S.Ct. at 321–22. The Court found that the law unconstitutionally forced the architects to choose between their livelihood and their privilege, and it found little difference between the threat of job loss to a state employee and the threat of loss of contracts to a contractor. *Id.* at 82–83, 94 S.Ct. at 324–25. Although the prospectively presented Hobson's choice rationale of *Gardner* was enough to resolve the matter, the Court expressly found the narrow-inquiry-into-performance-of-official-duties exception inapplicable to mere contractors, *id.* at 83, 94 S.Ct. at 325, apparently reasoning that, unlike public employees, contractors are not instruments of the public trust to an extent sufficient to support the exception. The Court was likely also influenced by the criminal nature of the proceeding in which the architects' testimony was sought. Thus, although the state certainly sought an accounting of the parties' exercise of the public trust, it had already undertaken efforts to criminally punish them for any shortcomings that the accounting revealed.

Temporally, the emerging theme of the *Garrity–Turley* line of cases is that the state can do after the fact what it cannot prospectively threaten, largely because coercive choices are by definition imposed prior to the responses they are intended to produce. In other words, although the state can discharge an officer who wields the public trust for refusing to respond to a properly limited inquiry, it cannot insist on a broad waiver of the Fifth Amendment privilege or threaten the loss of employment for refusing such a waiver before questioning commences. And while the state can afterwards penalize for impeding an investigation by invoking the self-incrimination privilege, it cannot do so merely for use of the privilege itself. Thus, the use of the privilege must have an instrumental obfuscatory effect and cannot alone serve as the basis of a sanction. This characterization is precisely true, however, only if one accepts the *Spevack* dissent's view that the petitioner there had yet to speak and, since a waiver of his Fifth Amendments rights was not demanded, self-incrimination concerns applied only obliquely. In this light, *Garrity, Gardner, Sanitation Men,* and *Turley* are compulsion cases. In each, the persons being investigated were put to the choice of waiving a constitutional right or losing a meaningful economic benefit solely for refusing to do so. Significantly, notions against coercion were strengthened by the criminal context of all the investigations. *Spevack,* in contrast, is an inference case and concerns only the extent to which one may be deemed guilty of certain conduct merely for refusing to testify about the conduct.

Substantively, these cases fall on the same side of another axis the Supreme Court has repeatedly defined. It distinguishes between an inquiry limited to the performance of public duties and one, however limited, that expressly or impliedly contemplates criminal prosecution as its goal. The exception, again, is *Spevack,* which included no underly-

ing or parallel criminal investigation and involved only civil proceedings. The severity of disbarment, however, was sufficiently compelling to warrant treatment similar to the other four cases that did occur in a criminal context. Moreover, the penalty was imposed precisely for invoking a constitutional right and without regard to whether the underlying allegations were true or the extent to which the refusal to speak impeded properly limited investigation. Support for the existence of this second axis lies in the various ultimate uses of the Fifth Amendment privilege. Assuming the per se invalidity of attempts to force others to choose between relinquishment of a constitutional right and loss of employment or its equivalent, what we term the temporal or coercive axis, these cases frown on use of the invocation of the self-incrimination privilege as automatic, conclusive evidence that the acts of which one is accused actually occurred. Hence, the Supreme Court's repeated direction to specific, narrow, direct inquiries into the performance of official duties that involve the exercise of the public trust. The refusal to answer here, which the Court has time and again deemed sound reason for discharge, results in no automatic inference of truth or guilt. It does, however, impede investigation, and, when the public trust is at issue, the Court's statements reveal that it endorses state decisions which find such impediment intolerable.

The contours of the temporal and substantive axes we identify above were clarified in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), another inference case. The petitioner, a prison inmate who was the subject of a disciplinary proceeding at San Quentin, was prospectively informed that he could choose not to testify, but that his silence could then be used against him. *Id.* at 312, 96 S.Ct. at 1555. Rather than deeming this a coercive choice, the Court found it merely "a realistic reflection of the evidentiary significance of the choice to remain silent" in the face of much incriminating evidence. *Id.* at 318, 96 S.Ct. at 1558. No waiver of constitutional rights was demanded of the petitioner. Notably absent from *Baxter* was any law or rule that automatically inferred guilt or truth from invocation of the privilege. Further, although it was a civil proceeding, its undeniably criminal flavor allowed for no distinction between criminal investigation and narrow inquiry into public duties. The Court's silence on this issue in *Baxter* merely means that a prisoner, as neither public employee nor officer of any sort, in no way wields the public trust. The authorities' prospective warning was ameliorated by the absence of a rule of automatic guilt or punishment and, ironically, because inferring truth was the only use to which invocation of the privilege could be put because no lesser inquiry was possible. A prisoner performs no public duties and consequently, when accused of wrongdoing, can impede no parallel civil investigation into his failure to fulfill them. Thus, the nonexistence of the substantive axis of the *Garrity–Turley* line of cases left the authorities free to deem him guilty of the charged conduct.

### 2. Application

■ The case at hand falls on the permissible side of both axes we identify in what is now the *Garrity–Baxter* cases. Scherr was put to no Hobson's choice between the privilege he invoked and his continued ability to earn a living. Thus, the prospectively sought waiver of constitutional rights on pain of predetermined penalties on which *Garrity*, *Gardner*, and *Sanitation Men* are largely based, presents no bar to Scherr's disqualification or sanction.

Neither was Scherr's testimony sought for use in a criminal prosecution against him. Both the discovery and sanctions hearings were specific and narrow inquiries into Scherr's exercise of the public trust with which he is vested as an officer of the court. In the opening pages of this opinion, we expound on the high calling that is the law. Aside from the generally elevated standards that should accompany practice in the profession, eager and forthcoming compliance with rigorous ethical rules is demanded ·by the lawyer's role in our social, political, and legal processes. If the lawyer is essential to healthy democracy, he is certainly critical to a just legal system. *Bates v. State Bar*, 433 U.S. 350, 360–61, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810 (1977). And as·an officer of the

entity at the crux of that system, the lawyer is subject to different, if not higher, standards. When a lawyer acts in a representative capacity in a court of law, as the lawyer alone may, certain duties are undertaken to the court and the lawyer is thereby vested with the public trust.

Having concluded that Scherr was vested with the public trust, it remains only to determine whether the hearings in which he was involved were appropriately limited inquiries into his exercise of that trust. Both proceedings were designed to resolve one of the discovery disputes so prevalent in civil litigation. To be sure, events had grown interesting by the time of the sanctions hearing. Scherr had been accused of theft and was the subject of a police complaint. Neither fact, however, alters the character of the hearing. It was civil in nature and contemplated no future criminal prosecution. Although the underlying litigation obviously involved Scherr's clients more than himself, the critical portion of the discovery hearing and the whole of the sanctions hearing concerned only him and his conduct as an officer of the court.[10] Opposing counsel and the trial court sought and were entitled to an accounting of Scherr's use of the public trust bestowed on him. This trust obligated Scherr to respond to the accusations leveled against him, and while the trial court could not have vigorously demanded as much, we find that it should have imposed some meaningful penalty on Scherr for his refusal to do so.

Scherr himself attempted to expand the scope of the sanctions hearing to include inquiry into his clients' interests by invoking the attorney-client and work product discovery privileges in addition to the Fifth Amendment. Both discovery privileges necessarily involved his clients, and he therefore acted properly to protect them. We are inclined to believe that a lawyer always prop-erly exercises the public trust in the role as an officer of the court when he acts to protect or further the interests of the client. This is a necessary and virtuous product of our representative, adversarial system of justice. When Scherr invoked his privilege against self-incrimination, however, he divorced his clients' interests from his own. He did not purport to invoke the privilege on their behalf and made clear that counsel accompanying him to the sanctions hearing represented his interests, not those of his clients. In refusing questions on this latter ground, he refused to account for his own performance as officer of the court.

We emphasize that we do not penalize Scherr for invoking a constitutional right. We penalize him for obstructing an inquiry into the performance of his lawyerly duties and for the merely presumptive possession of confidential information. Neither do we use his invocation of the self-incrimination privilege to assume the truth of the allegations against him. We use his refusal to account for his professional conduct for a reason unrelated to his client only to establish that he thwarted reasonable and legitimate inquiry into the propriety of his court-related conduct and to support a needed rule that benefits litigants and the public at large.[11] Accordingly, we limit the operative sphere of the inquiry to Scherr's fulfillment of the duties he owes the Bar and the Courts. We similarly limit any sanction. Thus, we disqualify Scherr only from this case, and we order the trial court to impose a sanction that will not affect Scherr's clients.

### 3. Ameliorating Factors

We here undertake explication of several other factors that curtail any encroachment on the various axes of propriety defined by the *Garrity–Baxter* line of cases. Foremost

---

**10.** We are unconcerned with the extent to which the scope of the hearing may have inadvertently touched on other matters. Scherr's invocation of various privileges that encompass more than his narrow, personal interests did nothing to contribute to the **improper** obstruction of investigation into the performance of his office. We therefore exclude from this proceeding the use of privileges whose scope extend beyond Scherr personally.

**11.** In light of the allegations made here, we order the Clerk of this Court to forward a copy of this opinion to the State Bar of Texas for investigation and any disciplinary action it deems warranted. *See* TEX. DISCIPLINARY R. PROF. CONDUCT 1.09, 3.03, 8.04; TEX.CODE JUD.CONDUCT, Canon 3D(2)(1994), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G., app. B (Vernon Supp.1995).

among these is the state interest in securing the "enormous responsibilities" of the Bar, *Law Students Civil Rights Research Council, Inc. v. Wadmond,* 401 U.S. 154, 185, 91 S.Ct. 720, 737, 27 L.Ed.2d 749 (Black, J., dissenting), in which we here effectively participate. In this State, lawyers are governed by the Texas Supreme Court, which has delegated its authority to the State Bar of Texas. Both the Courts and the Bar therefore play a role in policing misconduct by lawyers. Neither the system nor any individual actor in it benefits from misconduct, and our profession's standing is certainly not elevated by it. The very accusation of such activity understandably concerns the public and justifies formal investigation of it. When the accusations are met with stony silence or, worse, affirmative obstruction of inquiry into them, the result denigrates us all.

We earlier noted that lawyers, by virtue of their special office, are subject to different, if not higher, standards. We refer largely to the myriad circumstances that can conflict a lawyer out of lucrative and otherwise lawful employment. Lawyers frequently change firms and thereby inescapably encounter difficulty representing certain potential clients. At the extreme, it is obvious that a single lawyer could not be employed to serve every legal need in a given region. At some point, the lawyer is called upon to represent one client against another. This a lawyer cannot do. Yet we do not suffer the lawyer to bring a claim that the applicable ethical rules effect an unconstitutional governmental taking. The lawyer must select clients carefully to further one's own economic interests. Similarly, the rules we announce today force the lawyer to an election. The constitutional privilege against self-incrimination is the lawyer's, as it is any citizen's, and such privilege may be exercised liberally. But when doing so impedes legitimate, non-criminal, non-career-ending inquiry into the exercise of the lawyer's own office, or lets fester the appearance that the lawyer improperly possesses confidential information, the lawyer may not continue in the representation. Moreover, the lawyer is subjected to court-imposed sanctions for creating the impediment and acquiescing in the appearance.

Lastly, we emphasize the relatively mild consequences we today attach to Scherr's conduct. We do not incarcerate him. *Cf. Garrity,* 385 U.S. at 493, 87 S.Ct. at 616 (criminal conspiracy convictions). We do not disbar him. *Cf. Spevack,* 385 U.S. at 511, 87 S.Ct. at 625. We do not even prevent him from representing a particular class of clients. *Cf. Turley,* 414 U.S. at 70, 94 S.Ct. at 316 (prohibition on contracting with state). We merely disqualify him and his law firm from this case for his presumptive possession of confidential information, and we order the trial court to impose a personal sanction on him for impeding inquiry into the performance of his office. We should not here be read to retreat from our conclusion that the hearings were narrowly focused inquiries into the discharge of Scherr's public responsibilities, which the *Garrity–Baxter* cases instruct would support his disbarment. We merely point out that our judgment imposes on Scherr far lesser burdens than those at issue in the *Garrity–Baxter* cases.

## F. MANDAMUS IS AN APPROPRIATE REMEDY IN THIS CASE

### 1. Abuse of Discretion

An appellate court rarely interferes with a trial court's exercise of discretion. A clear abuse of discretion warrants correction by mandamus when a court issues a decision without basis in or reference to guiding principles of law. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985); *Professional Microfilming, Inc. v. Houston,* 661 S.W.2d 767, 769 (Tex. App.—Fort Worth 1983, orig. proceeding). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding) (clear failure by trial court to analyze or apply the law correctly will constitute abuse of discretion). The failure of the trial court to apply the proper legal standard to a motion is an abuse of discretion. *NCNB Texas Nat'l Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989) (trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel). In this case, we find that the trial

court failed to apply the proper legal standard to the facts at issue.

### 2. No adequate remedy by appeal

█ An appellate court will deny mandamus relief if another remedy, usually appeal, is available and adequate. *Street v. Second Court of Appeals,* 715 S.W.2d 638, 639–40 (Tex.1986) (orig. proceeding). In this case, the continued violation of the text and spirit of the Disciplinary Rules of Professional Conduct is the harm for which there is no adequate remedy by appeal.

### 3. Disqualification and Sanction are Mandatory

█ Disqualification of an attorney is a severe remedy. *See Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990) (orig. proceeding). The Texas Supreme Court has condemned the dilatory filing of attorney-disqualification motions. *See Spears,* 797 S.W.2d at 656 n. 1. Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice under this standard. *Cf. Spears,* 797 S.W.2d at 656 (citing *NCNB Texas Nat'l Bank,* 765 S.W.2d at 400). In this case, however, it is not the mere allegation of wrongdoing that requires Scherr's disqualification. Rather, it is Scherr's action taken in the face of the allegations that has created the presumption that he is improperly in possession of Relators' confidences and that establishes that unjustifiably impeded legitimate investigation into his court-related conduct as a lawyer. Pursuant to Disciplinary Rules of Professional Conduct 1.05 and 1.09, Scherr cannot be permitted to continue in the current representation when he is presumed to hold confidences belonging to Relators. Likewise, the firm of Scherr & Legate must be disqualified because Scherr is presumed to have shared the confidences with the other members of his firm. *See Petroleum Wholesale,* 751 S.W.2d at 299. Pursuant to Disciplinary Rule of Professional Conduct 8.04 and Texas Rule of Civil Procedure 215, Scherr cannot be allowed to flout official inquiry into his professional conduct without penalty. Rule 8.04 does not tolerate Scherr's efforts to avoid accounting for the exercise of his public trust as an officer of the court, and his refusal to so account requires a sanction.

### III. CONCLUSION

On these fact, mandamus will lie to correct the trial court's misapplication of the law to the facts. We conditionally grant the writ of mandamus, and order Respondent to rescind his order on the February 22 hearing to the extent that it does not disqualify Scherr and Scherr & Legate from representing the plaintiffs in the underlying suit and does not sanction Scherr. We further order that Respondent issue an order disqualifying Scherr and Scherr & Legate from representing the plaintiffs in the underlying suit and imposing a sanction on Scherr. We are confident that the trial court will comply with these orders. The writ of mandamus will issue only if the trial court fails to do so.